**INTERNATIONAL UNION OF ELECTRICAL AND MACHINE WORKERS, AFL-CIO-CLC, Plaintiff,**

v.

**GENERAL ELECTRIC COMPANY and Metropolitan Life Insurance Company, Defendants.**

**No. 70 Civ. 2893.**

United States District Court, S. D. New York.

Jan. 11, 1972.

**818**

Irving Abramson, New York City, for plaintiff; by Winn Newman and Robert Friedman, New York City, of counsel.

Aranow, Brodsky, Bohlinger, Benetar, Einhorn & Dann, New York City, for defendant General Electric Co.; by David L. Benetar, Stanley Schair, and Robert E. Helpern, New York City, of counsel.

POLLACK, District Judge.

This is a suit claiming an alleged violation of an Insurance Plan established pursuant to a Pension and Insurance Agreement made as part of a labor collective bargaining agreement.

The parties are subject to the provisions of the Labor-Management Relations Act of 1947, as amended, and the Court has jurisdiction of the parties and of the subject matter thereunder. 29 U.S.C.A. § 185.

For the past 20 years, General Electric Company (the Company hereafter) and the International Union of Electrical Radio and Machine Workers, AFL–CIO–CLC (the Union hereafter) have been parties to a series of national collective bargaining agreements covering many thousands of Company employees, represented by the Union or one of its local union affiliates, at various plant locations throughout the United States. Aside from these specific national collective bargaining agreements (hereinafter referred to as "National Agreements" or, individually, as "National Agreement"), the parties entered into various other agreements covering the terms and conditions of employment of the represented employees. Among such other agreements were Pension and Insurance Agreements, providing for various insurance benefits for the employees.

The plaintiff Union claims that the Company wrongfully rejected sickness and accident claims filed pursuant to the said Plan; or, in the alternative, that the Company should return to the employees so much of their contributions to the cost of insurance which is attributable to a period when no sickness

and accident coverage was provided for the employees.

The central issue in this case is the intent and interpretation of two clauses in the Plan which govern sickness and accident benefits when an employee is voluntarily absent from work by reason of a strike. The Company advanced the entire premiums on the insurance and, after the strike, reimbursed itself by deducting from the employees' compensation the regular contribution due from the employee under the Plan. Consequently, the alternate issue is whether an employee was obligated to reimburse the Company for the full contribution for the period of a strike when the Plan provides that a strike terminates his sickness and accident coverage for the duration of his absence from work.

The particular agreement which is the subject of this suit is a 1966 Pension and Insurance Agreement, ("Agreement" hereafter), which, by its terms, incorporated an Insurance Plan negotiated between the parties and dated October 3, 1966; this was attached to and made part of the agreement.

The 1966 Insurance Plan provided various forms of insurance for eligible employees, viz., life insurance, accidental death or dismemberment insurance, comprehensive medical expense insurance and coverage for total disability resulting from a non-occupational sickness or accident. The latter coverage provided weekly benefits, equal in amount to one-half of a disabled employee's normal straight-time weekly earnings up to a maximum weekly benefit of $100, after the seventh day of total disability or the first day of a hospitalization, if earlier, and up to a maximum of 26 weeks.

Although weekly sickness and accident coverage had existed in earlier insurance plans between the parties, the 1966 Insurance Plan, for the first time, included the following provision:

If you cease work because of a strike, your insurance coverage will automatically terminate at the end of the period for which your contributions have been paid. However, the Company may, in its discretion, make appropriate arangements to continue your coverage under this Plan during such strike.

In any event, Weekly Sickness and Accident coverage will not be continued beyond 31 days from the last day for which your contributions are paid and will not be reinstated until you return to active work.

The parties signed a memorandum settling the 1966 negotiations on October 14, 1966. Under the Pension and Insurance Agreement and the 1966 Insurance Plan, the Company admittedly undertook primary responsibility for furnishing Weekly Sickness and Accident coverage to represented employees. Where the Company furnished such coverage through an insurance carrier (as here, through defendant Metropolitan Life Insurance Company), the Company was, *in effect*, a self-insurer. In California, where the Company made no arrangements with any insurance carrier, it was a self-insurer in form and effect.[1]

The 1966 National Agreement between the parties stated *inter alia* that the 1966 Pension and Insurance Agreement was in full settlement of all collective bargaining issues raised during the 1966 negotiations between the parties. Under the 1966 National Agreement, the Union-represented employees had the right to

1. The parties stipulated with the approval of the Court that all proceedings in this action against the defendant Metropolitan Life Insurance Company be stayed as of May 11, 1971, until such time as the Court should vacate the stay and that none of the proceedings during the stay should be binding on defendant Metro-

politan. Metropolitan reserved its right to move for dismissal as a party herein on the grounds of lack of jurisdiction of the subject matter and for failure to state a claim against it. The plaintiff reserved its right to urge that Metropolitan is within the pendent jurisdiction of the Court.

strike during the term of such agreement over certain fully processed but unsettled local grievances. After October 3, 1966, the effective date of the 1966 Pension and Insurance Agreement, there were a number of such contractually-permitted local grievance strikes, some of which lasted for more than 31 days.

At midnight on October 26, 1969, at the expiration of the 1966 National Agreement, a national strike was called by the Union against the Company. This strike lasted 102 days, until February 5, 1970.

■ During the strike, certain striking employees filed claims, which were rejected, for weekly sickness and accident benefits for disabilities which arose during the strike period but more than 31 days after the commencement of the strike. The rejection of such claims by the Company was proper and in accordance with what the Court finds to be claims excluded from coverage under the 1966 Insurance Plan as negotiated by the Company and the Union.

The parties intended and agreed in their Agreement and Plan that, for those absenting themselves from work voluntarily during a strike, all insurance coverage would automatically terminate at the date up to which they had paid their contributions toward the cost of the insurance coverage. Such payments were made by deductions from their weekly or other periodic pay for services. In this case the strikers were paid on Friday, October 31, 1969, for services up through the preceding Friday before the commencement of the strike which occurred at midnight on Sunday, October 26, 1969. Thus, the 31 day limit on cognizable claims for sickness and accident coverage commenced to run on October 26, 1969.

During the strike, the absent employees did not receive any pay from the Company and they made no contributions toward the cost of insurance coverage. However, as appears in the quotation from the Plan, *supra,* the Company could, "in its discretion, make ap- propriate arrangements to continue [the employees'] coverage under this Plan during such strike." In fact, the Company did exercise its discretion and did make such arrangements. This action of the Company together with the fact that, after the strike was over, the Company collected an amount which was equivalent to the deduction from compensation, would have been if made during the strike for insurance coverage, ground the contention of the Union that the Company improperly claims that sickness and accident coverage was terminated during the strike, except for the first 31 days thereof.

The option of the Company to maintain insurance coverage during a strike is immediately followed in the Plan by the express provision that, "In any event, Weekly Sickness and Accident coverage will not be continued . . . and will not be reinstated until you return to active work." No clearer expression of an exclusion could be made qualifying the effect of the discretionary continuance by the Company of insurance coverage during a strike.

When the striking employees returned to active work, the Company made double deductions from the strikers' weekly pay. One deduction covered current contributions for insurance coverage, while the other deduction covered the whole of the insurance contribution for all categories of insurance which the striking employee would have paid during the strike period, if in fact there had been no strike. Thus, the after-the-strike deduction necessarily included the employee's contribution to the cost of sickness and accident coverage. Otherwise, it would have to be deemed that the portion of the contribution toward the cost of sickness and accident coverage had been shifted to help pay for other categories of insurance, or else the contribution could be considered to have been forfeited by absence during the strike. These latter deductions to make up for the strike period continued until such time as the Company received full reimbursement from the employees.

As a matter of practice in the past, after termination of local grievance strikes which had occurred after effectiveness of the 1966 Agreement and Insurance Plan, all striking employees who returned to work and desired to continue to receive coverage under the Insurance Plan without reapplication for insurance were required by the Company to reimburse it for any and all sums paid with respect to insurance coverage by the Company on behalf of striking employees during the course of the strike. No such sums were collected by the Company from strikers who failed to return to work or who returned but objected to such collections.

Striking employees who returned to work after the 1969 strike were not asked to consent to the collection of double deductions prior to their being made. The Company had stated in bulletins to its employees at various times and plant locations that if insurance coverage were continued in the Company's discretion, regular contributions for insurance coverage would be collected from employees when they returned to work. The Company advised the Union and various locals thereof to the same effect.

However, there was no provision in the Agreement or in the Plan with respect to that portion of the contribution that might be thought to be attributable to the cost of insurance coverage that remained suspended during a strike; there was no provision which forfeited the allocable share of the contribution for terminated sickness and accident coverage or considered the contribution to be applicable solely to the cost of continued coverage under the other forms of insurance provided.

■ The sickness and accident coverage was intended to provide against loss of earnings during sickness or after an accident, that is, to assure income to the employee during involuntary absence from work. An employee was privileged to voluntarily absent himself from work. The suspension of his earnings during voluntary absence by reason of an existing strike could not be ascribed to sickness and accident.

The premiums payable for the various forms of insurance in the overall package made available to employees were paid for by the Company in the first instance. The employee's contribution to the costs of the insurance was an agreed $\%_{10}$ of 1% of the employee's normal straight-time annual compensation, except that if the employee elected to waive medical coverage for himself, his contribution was at the rate of $\%_{10}$ of 1% of compensation. The amount of the employee's contribution was established for the entire package of insurance benefits without allocation (excepting as to medical expense coverage) and without any relation to the cost of the coverage of any particular form of insurance. The employee's contribution was not an actuarily computed amount. Initially the employee's contribution in fact represented about one-half of the cost of all insurance benefits but the ratio has not remained the same during the recent period of rising costs of insurance. The fixed amount of $\%_{10}$ of 1% (or $\%_{10}$ of 1%) as an employee's contribution to costs of the insurance coverages still stands.[2]

The credible evidence and the circumstances and probabilities overwhelmingly indicate that the sums collected from striking employees after the strikes as reimbursements were not "contributions" for the sickness and accident coverage in the sense in which the Plan uses that term in the strike provision of the 1966 Insurance Plan.

■ Self-evidently, it is not the Court's function to rewrite improvident or even inequitable understandings in the absence of fraud or other overreaching of a party to an agreement. Nor should the Court add a term to the agreement. There is no evidence whatsoever

2. The percent of the net cost of providing employee coverage under the Plan paid for by employee contributions has decreased from 53.1% in 1956 to 27.8% in 1969, while the cost to the Company has increased from 46.9% in 1956 to 72.2% in 1969.

that any impropriety was practiced here or affected or tainted this agreement. The Company gave each employee an opportunity to elect not to pay the double deduction and to reject the insurance coverage which the Company provided by making arrangements to continue the coverage of employees under the Plan during the strike period. If any employee elected not to pay the double deduction this would terminate all categories of insurance as to such employee until he rejoined the Plan, if then eligible. Moreover, striking employees who became disabled during the strike (including the employees whose claims are involved in this case) were not called upon to pay sums equal to the regular contributions they did not pay during the period they were totally disabled. This was by virtue of the provision of the Insurance Plan which waives such contributions up to a maximum period of one year in the event of total disability; this disability waiver applies to all insurance coverage and without regard to whether there is a strike.

Thus, the sickness and accident insurance coverage, in conformity with the terms of the intended and agreed arrangement of the parties as expressed in the contract and as applied to this controversy, was not continued beyond 31 days from October 26, 1969; such coverage was terminated after the 31 day period and the employee was not entitled to reinstatement of the coverage for sickness and accident until the employee returned to active work.

The General Electric employees were repeatedly informed in respect of the termination of sickness and accident benefits during a strike lasting more than 31 days and were specifically so informed in respect of the strike commenced October 26, 1969, in communications reasonably calculated to reach all of them.

A similar 31 day rule had been in the contract with the Union for lay-offs and leaves of absence for a number of years before 1966 and before there was any specific reference in the contract to strikes. The Company position known to and accepted by the Union was that the 31 day rule applied to strikers in the same fashion as it did to any others who voluntarily absented themselves from work. The new strike clause was set forth in an entirely new paragraph in 1966 and was the subject of discussion and was fully understood by the negotiating parties.

The "contribution" referred to in the sickness and accident portion of the so-called strike clause was intended and agreed to refer to and does refer to the contribution made by the employee covering his last pay period prior to any strike and any ambiguity in the sickness and accident clause that might be thought to exist in the expression of such intent and agreement is resolved accordingly.

As an alternative claim to the claims for sickness and accident benefits which were rejected, the Union has asserted that in the event the defendants are found not to have violated the express provisions of the Agreement and the Plan, nonetheless the Company was overpaid, by requiring, in effect, that striking employees reimburse them, by amounts included in the double deductions, for insurance coverage with respect to sickness and accident benefits. The Union contends that inasmuch as such coverage was not provided, the Company was unjustly enriched by obtaining a contribution towards the cost of coverage which was not afforded during the period of voluntary absence from work.

It is no sufficient answer to this alternative equitable claim to say that prior practice of the Company was to make double deductions from the strikers' weekly pay, one of which was to cover the insurance contributions for all categories of insurance which would have been paid if in fact there had been no strike. As noted previously, the other categories of insurance and insurance benefits were not terminated or suspended by any provision of the Agree-

ment or the Plan or action of the Company during the strike period. The sickness and accident coverage was terminated "In any event" "until . . . return to active work" because of the express agreement to that effect. As stated previously, there was no agreement by the parties that the employees should be charged directly or indirectly in a package deal for sickness and accident coverage when in fact they were not entitled to such coverage and were not provided therewith by the Company during the strike period.

The 1966 Pension and Insurance Agreement specifically provided that:

*Section 4*

This Agreement for the term hereof shall be the exclusive and definitive agreement between the parties with respect to Pensions and Insurance.

If, as is correctly contended by the Union, the subject agreement incorporating the 1966 Insurance Plan is the final and complete expression of the agreement on insurance as adopted by the parties, there is no room for reading into the agreement something that is not set forth there, namely, that the Company is entitled to receive double contributions after the return to active work in payment for coverage during the strike period albeit that the coverage (for sickness and accident) was not afforded by reason of an express provision of the contract.

Seemingly, it would be a harsh result to deny coverage for the period of the strike (excepting the first 31 days) and yet to exact a contribution toward the premium for coverage during that period. The alternative given to the employee of cancelling all insurance coverage as of 60 days from the date of the strike hardly meets the equities of the situation. The coverage included categories of insurance not affected by the incidents of absence due to strike.

Nor as to this branch of the Union's claim is it an answer that the Company had stated in bulletins to its employees at various times and plant locations that regular contributions for the period, if any, during which insurance was continued during a strike would be collected from employees when they returned to work. The fact of the matter is that the insurance for sickness and accident was terminated and that is the reason why sickness and accident claims have properly been denied, and the proratable premium paid for coverage was not earned.

Although the Company has never computed what portion of the %₁₀ of 1% is allocable to the cost of weekly sickness and accident coverage, the Union contends that documents furnished by the Company to the Union indicate that such a computation may easily be made under three different formulae. Moreover, the Company allegedly has stated to the Union across the bargaining table that one-third of the employee's contribution may be allocated to each of the three main categories of insurance coverage. Circumstantial indication in part in support of the Union's position appears in the value ascribed to comprehensive medical expense coverage by the reduction of the required contribution from %₁₀ to %₁₀ of 1% of compensation in the event that the employee desires to forego such medical expense coverage.

It is a well-recognized general rule that where the fact of damage is clear and only the amount needs to be fixed, the trier of the facts may make a reasonable estimate of the damages under the circumstances. That rule should be applied here should the parties be unable to agree on the unearned portion of the post-strike contribution made toward cost of insurance coverage applicable to sickness and accident insurance which the employee did not receive.

Accordingly, an assessment of damages will be ordered here, unless, prior to the entry of judgment hereon, the parties can agree on the amount of the unearned contribution for sickness and accident coverage included in the double deductions from the compensation of the employees after they returned to active

work following the strike. Failing such agreement, proof will be taken in a convenient manner on the issue of damages to which the Union on behalf of the employees is entitled under this branch of the claim.[3]

## CONCLUSIONS

Accordingly, the Court concludes that the Company did not violate the terms and conditions of the 1966 Insurance Plan with respect to weekly sickness and accident coverage during strike periods by rejecting claims for such coverage made by striking employees which arose more than 31 days after the strike commenced on October 26, 1969. Employees who became disabled more than 31 days after October 26, 1969, and who were voluntarily absent from active work thereafter were not eligible to receive or entitled to sickness and accident benefits under the provisions of the Insurance Agreement and Plan until their return to active work. The first claim set forth in the complaint is accordingly dismissed on the merits.

The employees represented by the plaintiff are entitled to be reimbursed for the portion of their contribution to the cost of sickness and accident coverage which was not afforded to them during the termination of the coverage. The parties shall have 2 weeks from the date hereof to submit to the Court an agreed figure to be entered in the judgment hereon, without prejudice to any position of the Company in respect thereof, representing the amount hereby awarded to such employees; failing such agreement, the Court will fix the procedure to ascertain the amount which should be awarded to such employees under this determination.

The Union is entitled to costs of suit.

The foregoing shall constitute the findings of fact and conclusions required by Fed.R.Civ.P. 52(a).

So ordered.

3. At the conclusion of the trial, plaintiff's counsel estimated that the unearned premium for sickness and accident cover-

age was $1.10 per month per employee during the absence of the employees from work by reason of the strike.