361 F.3d 134
 THE NORTH RIVER INSURANCE COMPANY, A New Jersey Insurance Company and International Insurance Company, An Illinois Insurance Company, Plaintiffs — Appellees,
v.
ACE AMERICAN REINSURANCE COMPANY, a Pennsylvania Insurance Company, Defendant — Appellant.
 Docket No. 02-7902.
 United States Court of Appeals, Second Circuit.
 Argued: March 3, 2003.
 Decided: March 15, 2004.
 
 1
 COPYRIGHT MATERIAL OMITTED Carter G. Phillips (William M. Sneed and James D. Arden, on the brief), Sidley Austin Brown & Wood LLP, Chicago, IL, for Plaintiffs-Appellees.
 
 
 2
 Walter E. Dellinger (Joshua P. Waldman, on the brief), O'Melveny & Myers, LLP, Washington, DC, (Thomas A. Allen and Davis S. Weiss, White & Williams, Philadelphia, PA, on the brief) for Defendant-Appellant.
 
 
 3
 Before: POOLER, B.D. PARKER, Circuit Judges, and HALL, District Judge.[1]
 
 
 4
 HALL, District Judge.
 
 
 5
 ACE American Reinsurance Company ("ACE") appeals from the district court's order granting summary judgment to appellees, North River Insurance Company and International Insurance Company (collectively "North River"), in a lawsuit arising out of a reinsurance bill dispute between the parties. The district court granted summary judgment for North River and ordered ACE to pay the disputed bill, reasoning that the deferential follow-the-fortunes[2] doctrine required ACE to accept North River's allocation. The court also ordered ACE to pay, pursuant to N.Y. C.P.L.R. § 5001, prejudgment interest on North River's entire, original claim, including interest on a payment that ACE had made to North River before summary judgment motions were filed. For reasons stated below, we affirm the district court's grant of summary judgment on the reinsurance issue and affirm in part and vacate in part the district court's prejudgment interest award, and remand for further proceedings consistent with this opinion.
 
 BACKGROUND
 
 6
 Simply put, "[r]einsurance is a contract by which one insurer insures the risks of another insurer." People ex rel. Cont'l Ins. Co. v. Miller, 177 N.Y. 515, 70 N.E. 10, 12 (1904). Under a reinsurance contract, the original insuring entity (the "reinsured") transfers, or "cedes," part or all of its risk under its policy of insurance to another entity (the "reinsurer"). When entering into a reinsurance contract, a reinsured agrees to pay a particular premium to a reinsurer in return for the reinsurer assuming the risk of a portion of the reinsured's potential financial exposure under certain direct insurance policies it has issued to its insured. See Travelers Cas. & Sur. Co. v. Certain Underwriters at Lloyd's of London, 96 N.Y.2d 583, 734 N.Y.S.2d 531, 760 N.E.2d 319, 322 (2001). In this way, a reinsured spreads its risk of loss from its direct-loss policies among other insurers.
 
 
 7
 North River insured the Owens-Corning Fiberglass Corporation ("Owens-Corning") between 1974 and 1983. North River's policies covered portions of the second, third, fourth, and fifth excess layers of Owens-Corning's coverage.[3] The second excess layer covered per-occurrence losses between $26 million and $76 million. North River insured a portion of this second excess layer in each year between 1974 and 1983. The total, per-occurrence limits of North River's second layer policies for the ten-year period was $345 million. North River also provided Owens-Corning with coverage in the third, fourth and fifth excess layers of coverage, insuring per-occurrence losses ranging, in certain years, from $76 million to $251 million.
 
 
 8
 With the exception of $125,000 of coverage in the third excess layer of the 1978-1980 policies, ACE reinsured only portions of the second excess layer policies issued by North River. The facultative reinsurance contracts between ACE and North River each contained a follow-the-fortunes provision, providing that the "liability of the Reinsurer ... shall follow that of the Company."
 
 
 9
 Due to its manufacture, sale, and installation of asbestos-containing insulation in the years 1953 through 1973, over 447,000 plaintiffs have named Owens-Corning as a defendant in asbestos-related lawsuits. By 1994, Owens-Corning faced exhaustion of its products liability coverage. Seeking to obtain additional coverage under its policies, Owens-Corning characterized many of its asbestos-related claims as "non-product" claims. Because these claims fell outside of the policies' products liability coverage, Owens-Corning argued that it was entitled to a new set of policy limits for those claims. In June 1999, Owens-Corning initiated an alternative dispute resolution proceeding under the Wellington Agreement,[4] seeking a declaration of its right to coverage under various North River policies. North River raised a number of defenses which, if successful, would have eliminated or dramatically reduced North River's liability under its policies.
 
 
 10
 Before the conclusion of that proceeding, North River and Owens-Corning settled for $335 million. North River did not concede coverage, and it obtained a full release of liability under all of its policies with Owens-Corning for not only asbestos-related claims, but also for any future, non-asbestos related claims.[5]
 
 
 11
 In reaching its decision to settle, North River considered a number of factors, including the likelihood that adjudication on the merits would result in a judgment implicating numerous layers of North River's policies. It conducted an analysis of possible outcomes and their likelihood if it were to litigate its dispute with Owens-Corning to conclusion. The settlement analysis included a computer model which demonstrated how a given level of Owens-Corning's "non-product" asbestos damage would impact North River's policies under particular coverage parameters. North River also utilized decision tree software, which incorporated consideration of coverage parameters and various potential defenses to Owens-Corning's claims, then applied probability weights to obtain different damage scenarios. At one point, North River's preliminary decision tree analysis set forth 83 different, probability-weighted, damage and coverage scenarios.
 
 
 12
 After settling with Owens-Corning, North River sought indemnification from its reinsurers. North River allocated one percent of the cost of the settlement to the "buyback" of North River's policies with Owens-Corning, which had terminated the policies, releasing all future claims. It allocated payment of that one percent among the reinsurers of all its policies according to the per-occurrence limits of each reinsurance policy. North River then allocated the remaining 99 percent of the cost of the settlement, which it designated as reimbursement for paid, non-product asbestos claims, among its reinsurers using the "rising bathtub" approach,[6] consistent with its view of the policies and the Wellington Agreement. The portion of the settlement allocated to pay non-product claims ($332 million) did not exceed North River's per occurrence limits within the second layer of excess coverage, which level totaled $345 million. In accordance with the reinsurance contracts in the second excess layer of coverage, North River sought $49 million from ACE. North River did not seek indemnification for any portion of the settlement attributed to nonproduct asbestos claims from its reinsurers of the third, fourth, and fifth excess layers of coverage.
 
 
 13
 ACE disputes the settlement allocation because North River assigned its entire settlement to ACE's layer of reinsurance (the second layer), even though North River's pre-settlement analysis of possible litigation outcomes identified risk of loss in higher layers. ACE argues that it should not have to contribute to the portion of the settlement that, under North River's pre-settlement analyses, reflected the risk to layers above ACE's layer of coverage being implicated. ACE's best estimate of the uncontested amount it owed was approximately $24 million, which it paid to North River three months after North River filed suit and approximately eight months after the date of North River's initial invoice.
 
 
 14
 The district court, adopting the rationale of Commercial Union Ins. Co. v. Seven Provinces Ins. Co., 9 F.Supp.2d 49, 67-68 (D.Mass.1998), aff'd, 217 F.3d 33 (1st Cir. 2000), held that the follow-the-fortunes doctrine applied and prevented ACE from contesting North River's post-settlement allocation of loss among reinsurers as long as that allocation was made in good faith and covered by the policy. The district court awarded North River the outstanding portion of its bill to ACE, deducting an amount that it found to have been improperly billed, and also awarded prejudgment interest pursuant to N.Y. C.P.L.R. § 5001. On appeal, ACE argues that the district court erred: (1) in finding that the follow-the-fortunes, or more aptly termed, follow-the-settlements doctrine, applied to North River's settlement allocation; and (2) by awarding prejudgment interest on the sum paid by ACE before summary judgment entered.
 
 DISCUSSION
 
 15
 A district court's grant of summary judgment is reviewed de novo, examining the evidence in the light most favorable to the non-movant and drawing all inferences in favor of it. See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is appropriate only if it can be established "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" Sheppard v. Beerman, 317 F.3d 351, 354-355 (2d Cir.2003) (quoting Fed. R.Civ.P. 56(c)).
 
 
 16
 I. The "Follow-The-Settlements" Doctrine And North River's Settlement Allocation
 
 
 17
 In this appeal, the parties dispute how the follow-the-settlements doctrine applies to a cedent's decision of how to allocate a settlement among its layers of reinsurance. North River argues that ACE's right to second-guess North River's allocation decisions are limited by the doctrine of follow-the-settlements, which requires a reinsurer to indemnify a cedent for a settlement as long as that settlement is reasonable and made in good faith. See, e.g., Christiania Gen. Ins. Corp. v. Great Am. Ins. Co., 979 F.2d 268, 280 (2d Cir.1992). North River urges this court to apply the follow-the-settlements doctrine to settlement allocation decisions in the same manner it is applied to the underlying settlement decision itself, requiring deference to a reinsured's allocation as long as it is reasonable and made in good faith, and within the cedent and reinsurance policies. ACE argues the contrary: that the doctrine does not bind a reinsurer to anything other than the cedent's settlement decisions, and certainly does not require it to "follow" a settlement allocation inconsistent with the reinsured's own pre-settlement analysis.
 
 
 18
 ACE does not question the reasonableness of North River's settlement with Owens-Corning, or the good faith of North River in deciding to settle or at what amount, nor does it question that the losses were of a type within the coverage of the underlying insurance contract. ACE only disputes North River's decision to allocate the settlement to a layer of reinsurance no higher than the second, even though that settlement eliminated risk to upper layers that had been identified and quantified by North River's pre-settlement analysis.
 
 
 19
 A. Applying The "Follow-The-Settlements" Doctrine To Post-Settlement Allocations
 
 
 20
 The follow-the-fortunes doctrine "binds a reinsurer to accept the cedent's good faith decisions on all things concerning the underlying insurance terms and claims against the underlying insured: coverage, tactics, lawsuits, compromise, resistance or capitulation." British Int'l Ins. Co. v. Seguros La Republica, S.A., 342 F.3d 78, 85 (2d Cir.2003). This doctrine insulates a reinsured's liability determinations from challenge by a reinsurer unless they are fraudulent, in bad faith, or the payments are "clearly beyond the scope of the original policy" or "in excess of [the reinsurer's] agreed-to exposure." Christiania, 979 F.2d at 280. "Basically, the doctrine burdens the reinsurer with those risks which the direct insurer bears under the direct insurer's policy covering the original insured." Bellefonte Reins. Co. v. Aetna Cas. & Sur. Co., 903 F.2d 910, 912 (2d Cir.1990). It is well-established that a follow-the-fortunes doctrine applies to all outcomes, including settlements and judgments. See N. River Ins. Co. v. CIGNA Reins. Co., 52 F.3d 1194, 1205 (3d Cir. 1995) ("Thus, we find the clause applies both to settlements and to judgments.").
 
 
 21
 ACE argues that Second Circuit precedent holds that the follow-the-settlements doctrine does not apply to a reinsurer's post-settlement allocation. For authority, it points to this court's decision in American Insurance Company v. North American Company for Property & Casualty Insurance, ("NACPAC"), as holding that a reinsurer is not bound by a settlement allocation that is inconsistent with the cedent's settlement analysis. 697 F.2d 79, 81 (2d Cir.1982). NACPAC concerned an attempt by a cedent to recover from its reinsurer a loss paid in a post-trial settlement, after the jury had awarded both compensatory and punitive damages. The settlement award clearly encompassed part of the punitive award, and because the policy did not cover punitive damages, the court refused to hold the reinsurer liable for risks beyond the scope of its policy. Id. at 81. ACE argues that this case establishes that the follow-the-settlements doctrine does not insulate a reinsured's post-settlement allocation decision from challenge by the reinsured.
 
 
 22
 NACPAC, however, simply holds that the follow-the-settlements doctrine does not bind a reinsurer to make payments outside the scope of its contractual obligations. Id. ("It is clear that the settlement here was primarily designed to compensate [the insured] for a punitive damage award that is excluded from the reinsurance policy."). While this holding is applicable to ACE's claim that North River's billings are outside the scope of the parties' contracts, discussed infra, it does not support ACE's contention that the follow-the-settlements doctrine does not apply at all to a post-settlement allocation, or that it does not apply when the allocation is inconsistent with the reinsured's pre-settlement analysis.
 
 
 23
 ACE further argues that the rationales for the follow-the-settlements doctrine — alignment of interests and discouraging coverage litigation — are not present when a reinsured allocates its losses among reinsurers in a manner inconsistent with its own pre-settlement analysis. ACE argues that North River's interests in allocating the loss to it are in conflict with those of ACE and thus a fundamental premise of the follow-the-settlements doctrine, mutuality of interest, is missing.
 
 
 24
 However, the existence of a mutuality of interest is not the only factor underlying the follow-the-settlements doctrine. In fact, the main rationale for the doctrine is to foster the "goals of maximum coverage and settlement" and to prevent courts, through "de novo review of [the cedent's] decision-making process," from undermining "the foundation of the cedent-reinsurer relationship." N. River, 52 F.3d at 1206 (internal citations omitted).
 
 
 25
 These goals are served by upholding North River's allocation here. ACE's appeal relies for its success not only on its theory regarding the limits of the follow-the-settlements doctrine, but also on the specific factual information on which it alleges North River relied in its settlement negotiations. But it is precisely this kind of intrusive factual inquiry into the settlement process, and the accompanying litigation, that the deference prescribed by the follow-the-settlements doctrine is designed to prevent. Requiring post-settlement allocation to match pre-settlement analyses would permit a reinsurer, and require the courts, to intensely scrutinize the specific factual information informing settlement negotiations, and would undermine the certainty that the general application of the doctrine to settlement decisions creates.
 
 
 26
 Applying the follow-the-settlements doctrine to post-settlement allocation decisions does not leave a reinsurer without protection. Cedents must make good-faith allocations, and reinsurers also cannot be held accountable for any loss not covered by the reinsurance policy. See Hartford Accident & Indem. Co. v. Columbia Cas. Co., 98 F.Supp.2d 251, 259 (D.Conn.2000) (finding material facts in dispute as to whether the reinsurer was bound by the "follow-the-settlements" provision of the reinsurance contract where the cedent's allocation may have reflected an effort to maximize the amount of reinsurance collected).
 
 
 27
 Therefore, the court holds that the follow-the-settlements doctrine extends to a cedent's post-settlement allocation decisions, regardless of whether an inquiry would reveal an inconsistency between that allocation and the cedent's pre-settlement assessments of risk, as long as the allocation meets the typical follow-the-settlements requirements, i.e., is in good faith, reasonable, and within the applicable policies.
 
 
 28
 B. ACE's Claim That The Reinsurance Policy Does Not Cover The Amounts Billed To It By North River
 
 
 29
 ACE further claims that, even if the follow-the-settlements doctrine does apply, the amounts billed to it by North River are outside the terms of the parties' reinsurance contracts. ACE objects to North River using a pre-settlement analysis to reach its decision to settle with Owens-Corning for $335 million, then using the rising bathtub method to allocate the settlement, ignoring its pre-settlement analysis and the assignment of risk to layers above ACE. ACE's argument implies that, in the context of settlement, "loss" under the policies is not the amount agreed upon in settlement, but is instead "exposure" or "risk of loss" according to the reinsured's pre-settlement analysis. We decline to adopt this view.
 
 
 30
 ACE contracted to reinsure the second excess layer of a number of policies that North River issued to Owens-Corning. These contracts specify that ACE would indemnify North River against "loss or damage" that North River is legally obligated to pay under the policy reinsured. Each of North River's second layer policies, including its policies with ACE, had an underlying trigger of $26 million. North River's upper layer policies, beginning with the policies in the third excess layer, were only implicated if the loss exceeded $76 million, the limits of policy coverage in the second excess layer.
 
 
 31
 According to the contracts at issue, once the value of Owens-Corning's covered loss is agreed to, each insurer's liability is determined by the terms of the insurance and reinsurance contracts. The contracts contained a follow-the-fortunes provision which directed that "[t]he liability of the Reinsurer shall follow that of the Company." The policies also contained a Loss Settlement clause, which provided, "[a]ll claims involving this reinsurance, when settled by the Company shall be binding on the Reinsurer, which shall be bound to pay its proportion of such settlements...."
 
 
 32
 ACE argues that, in deciding to settle, North River considered the risk of loss in layers above ACE, and that as a result, ACE is not liable for the portion of the settlement paid to release risks attributable to upper layers. ACE contends that such risks are outside the terms of its reinsurance contracts and that North River cannot use follow-the-settlements clauses to violate terms of those agreements. See Travelers Cas. & Sur., 734 N.Y.S.2d 531, 760 N.E.2d at 329; see also Bellefonte, 903 F.2d at 913 (follow-the-fortunes doctrine does not require reinsurer to indemnify losses in excess of the reinsurance certificate's stated policy limits); NAPAC, 697 F.2d at 81 (reinsurer not required, under follow-the-fortunes doctrine, to indemnify cedent for punitive damage award not contemplated by the terms of the insurance policy).
 
 
 33
 ACE's argument confuses risk of loss, and loss. ACE did not contract to pay "risk of loss," nor is it clear that North River could require its upper layer reinsurers to pay a "risk of loss." The reinsurance contract is "essentially a contract of indemnity" which does not arise until the reinsured has paid a claim. Christinia, 979 F.2d at 271; see also Fed. Ins. Co. v. Srivastava, 2 F.3d 98, 102 (5th Cir.1993) ("We must be careful not to shift contracted-for risks."). Though pre-settlement analysis informs an insurer, such as North River, about the risks it faces, the range of risk, and the likelihood of a particular risk, that risk of loss is not "loss" under either the initial policy of insurance or the reinsurance contract. This risk of loss upstream is the very rationale for insurance; it is presumably why the direct insured first obtained insurance, and why the reinsured sought to cede coverage to the reinsurer. Risk of loss pervades insurance calculations and decisions, but insurers and reinsurers like ACE obligate themselves to pay only for loss incurred.
 
 
 34
 An insurer may engage in all manner of analyses to inform its decision as to whether, and at what amount, to settle, but those analyses are irrelevant to the contractual obligation of the reinsurer to indemnify the reinsured for loss under the reinsurance policy. When a claim is adjudicated or compromised at a figure that falls within, e.g., the first layer of coverage, the risk as to the second and higher levels is eliminated, and no "loss" is suffered in any layer other than the first. North River's allocation of settlement loss, as opposed to risk of loss, is consistent with the reinsurance contract between North River and ACE, as well as the contracts between North River and its upper-layer reinsurers, each of which contain a policy coverage "floor" above the level of the loss amount indemnified here.
 
 
 35
 Nor do the contracts suggest in any way that "loss" under the reinsurance policy or the underlying policy should be defined differently in the context of settlement than it is in the context of adjudication. When North River settled its claims with Owens-Corning for $335 million, the parties agreed in compromise that the amount of Owens-Corning's insured loss, over the life of the policies, was $335 million, and settled all claims under North River's policies for the years 1974-1983. Because the total, per-occurrence coverage under those policies in the second excess layer was $345 million, the estimated loss did not exceed the coverage limits of those second excess layer policies. Therefore, because North River's policies in the third, fourth, and fifth excess layers were not implicated by the settlement, no loss having been paid in those layers, North River's method of allocation, in which the entire loss it had paid was attributed to its reinsurance policies in the second excess layer, does not violate the terms of its reinsurance contract with ACE.[7]
 
 
 36
 For these reasons, the court concludes both that the follow-the-settlements doctrine applies to North River's settlement allocation, and that the allocation was within the definition of "loss" contemplated by the insurance contracts.
 
 II. North River's Prejudgment Interest Award
 
 37
 ACE also challenges the District Court's award to North River of prejudgment interest both on the amount owed at the time of judgment and the portion of the bill that ACE had paid before either party moved for summary judgment. ACE argues that the latter sum was not at issue at the time of summary judgment and was not "awarded" by the court's judgment, making prejudgment interest under N.Y. C.P.L.R. § 5001 inappropriate. Section 5001 governs prejudgment interest in this case. See, e.g., Schwimmer v. Allstate Ins. Co., 176 F.3d 648, 650 (2d Cir.1999) (applying New York law to questions of prejudgment interest). Section 5001(a) provides:
 
 
 38
 Interest shall be recovered upon a sum awarded because of a breach of performance of a contract, or because of an act or omission depriving or otherwise interfering with title to, or possession or enjoyment of, property, except that in an action of an equitable nature, interest and the rate and date from which it shall be computed shall be in the court's discretion.
 
 
 39
 N.Y. C.P.L.R. § 5001(a). Subsection (b) provides that the interest begins to run "from the earliest ascertainable date the cause of action existed." Id. at § 5001(b). Subsection (c) requires the court or jury to specify the starting date for the interest calculation in the verdict or decision. It also provides, "[t]he amount of interest shall be computed ... to the date the verdict was rendered or the report or decision was made, and included in the total sum awarded." Id. at § 5001(c). The right to interest is "purely statutory and in derogation of the common law." Meloni v. Goord, 267 A.D.2d 977, 700 N.Y.S.2d 311, 311 (N.Y.App.Div.1999) (internal quotation marks omitted). The New York Court of Appeals has emphasized the importance of interpreting the "plain language" of the interest statutes. Rohring v. City of Niagra Falls, 84 N.Y.2d 60, 69, 614 N.Y.S.2d 714, 717, 638 N.E.2d 62, 65 (1994) (holding that postjudgment interest applies to the "total sum awarded," even the portions of the award that compensate for future damages).
 
 
 40
 North River filed suit on October 19, 2000, seeking payment of $49,281,800, the original amount billed to ACE. ACE paid $23,847,000 of the bill on January 18, 2001. The parties both moved for summary judgment on April 6, 2001; North River's motion requested a judgment for "$25,434,800, plus prejudgment interest." In its Order granting summary judgment for North River, the district court found that $25,434,800 was the amount put "in issue" by the parties' cross-motions for summary judgment, and entered summary judgment for plaintiffs in "the amount of $24,771,748, plus interest."[8] Thus the "sum awarded" by the district court was $24,771,748.
 
 
 41
 Relying on N.Y. C.P.L.R. § 5001, the district court granted North River prejudgment interest on the $24,771,748 awarded in its summary judgment order, as well as on ACE's January 18, 2001 payment. The court adopted the prejudgment interest calculation in the plaintiff's letter brief, which specified: interest on $48,618,748 (the full amount of the original bill minus the $663,052), running until the date of ACE's January payment; after that date, interest on the remaining $24,771,748, running to the date of judgment.
 
 
 42
 New York authority suggests that prejudgment interest under § 5001(a) applies only to partial payments if the claimant reserves its right to the interest upon receiving the payment.[9] Matter of Hoffman, 275 A.D.2d 372, 712 N.Y.S.2d 165, 166 (N.Y.App.Div.2000); Employers Ins. of Wausau v. Am. Centennial Ins. Co., No. 86-CIV-8576(KTD), 1989 WL 6631 at *3 (S.D.N.Y. Jan.24, 1989). In Hoffman, the Appellate Division held that, in order for a claimant to preserve its statutory rights to prejudgment interest on a partial payment, it must "accept[] the tender without prejudice to [the plaintiff's] claim for interest." 712 N.Y.S.2d at 166. The Southern District of New York used a similar approach in Employers Insurance of Wausau, denying a claim for prejudgment interest on amounts paid by time of trial because the plaintiff had "accepted tender of those amounts and made no demand for interest before or at the time of tender." 1989 WL 6631 at *3; see also R.B. Williams Holding Corp. v. Ameron Int'l Corp., 97-CV-0679E(SR), 2001 WL 266026, at *17 (W.D.N.Y. Mar. 12, 2001) (deducting payments already made before calculating prejudgment interest); cf. 7 Doyer St. Realty Corp. v. Great Cathay Dev. Corp., 43 A.D.2d 476, 352 N.Y.S.2d 483, 485 (1st Dept. 1974) (noting that post-judgment payment was made "pursuant to stipulation and without prejudice to the rights of either party on appeal" and noting that "interest continues to run" on the remaining amount). The Employers Ins. of Wausau court also found that the claimant had not demonstrated that it was its "custom and practice to receive or to pay interest on balances due."[10] 1989 WL 6631 at *3.
 
 
 43
 ACE and North River dispute in their briefs whether North River reserved its right to prejudgment interest when it accepted ACE's payment. ACE also argues that North River presented no evidence that it has a "custom or practice" of receiving interest on balances due.
 
 
 44
 The district court did not make any findings of fact or refer to any case law to support its prejudgment interest award. Instead, it adopted the "reasons stated in the plaintiffs' letter [brief]" as its reasoning.[11] Neither the court nor the plaintiffs' letter brief cited any cases from New York state courts, nor discussed the standards applied in Hoffman and Employers Ins. of Wausau, discussed above. See Matter of Hoffman, 712 N.Y.S.2d at 166; Employers Ins. of Wausau, 1989 WL 6631 at *3.
 
 
 45
 While we agree with the district judge below that the award of interest on the full amount sought until tender of the partial amount, and interest on the remaining amount until judgment, was a fair and reasonable result, the plain language of § 5001 only gives the court authority to award prejudgment interest on the "sum awarded," and, of course, a party can also reserve the right to receive prejudgment interest on a payment at the time it is made. Hoffman, 712 N.Y.S.2d at 166. However, the factual record before us is not sufficient to support a finding that the court "awarded" the full $48,618,748, with a set-off of ACE's partial payment, nor to support a determination that North River retained its right to prejudgment interest on the partial payment at the time of ACE's tender of that amount.
 
 
 46
 We therefore vacate the district court's prejudgment interest award on the partial payment made by ACE on January 18, 2001, and remand for further proceedings or findings of fact consistent with this opinion. Pursuant to the procedure utilized in United States v. Jacobson, 15 F.3d 19, 21-22 (2d Cir.1994), upon letter to the Clerk of this Court within 30 days of entry of the order following disposition of the prejudgment interest issue on remand, jurisdiction will automatically be restored to this appellate panel without a new notice of appeal.
 
 CONCLUSION
 
 47
 The judgment of the district court is affirmed with regard to the allocation of loss payments by North River to its reinsurer ACE, affirmed with regard to the district court's award of prejudgment interest on the sum awarded of $24,771,748, and vacated with regard to the award of prejudgment interest on ACE's January 18, 2001 payment, and remanded for proceedings consistent with this opinion.
 
 
 
 Notes:
 
 
 [1]
 The Honorable Janet C. Hall of the United States Court for the District of Connecticut, sitting by designation
 
 
 [2]
 The district court used the phrase "follow the fortunes." The parties use the narrower phrase "follow the settlements," which essentially describes the follow-the-fortunes doctrine in the settlement contextSee Commercial Union Ins. Co. v. Seven Provinces Ins. Co., 9 F.Supp.2d 49, 66 (D.Mass.1998), aff'd, 217 F.3d 33 (1st Cir.2000).
 
 
 [3]
 A policy in an "excess" layer insures covered claims that exceed the per-occurrence or aggregate limits of the policies in the primary or lower excess layers of insurance in that policy year
 
 
 [4]
 The Wellington Agreement, named for former Yale Law School Dean Harry Wellington, who assisted in its negotiation, is an accord reached between a group of insureds, facing thousands of asbestos-product claims, and their insurers. Both Owens-Corning and North River participated in the Wellington Agreement
 
 
 [5]
 In addition to this release, North River insisted on a buyback of all its policies with Owens-Corning. Having paid $1 billion for products losses, and then $335 million to resolve the non-product losses, it "never wanted to hear from Owens-Corning again."
 
 
 [6]
 The "rising bathtub" allocation method is a phrase used to describe a provision of the Wellington Agreement that deals with how asbestos bodily injury losses would be allocated to insurers. That provision calls for asbestos payments to be allocated on the basis of horizontal exhaustion, which means losses are allocated to the lowest layer of coverage first and, like a bathtub, fill from the bottom layer up. Under that approach, a given layer of coverage is not implicated until the layer beneath it is completely exhausted
 
 
 [7]
 North River's reinsurance billing allocated one percent of the settlement to the value of North River's policy buy-back, which extinguished its liability for non-asbestos related claims that might be brought by Owens-Corning. It distributed this one percent among all its policies based on policy limits and billed its reinsurers accordingly. In effect, this payment was not on account of any "loss," but rather to extinguish contract liability. ACE has not raised an issue about the 1% allocation on appeal
 
 
 [8]
 The district court found that $663,052 was improperly billed by North River
 
 
 [9]
 The New York Court of Appeals has not addressed the issue before this court. That court recently modified an Appellate Division decision interpreting the "sum awarded" language of § 5001, but the case is not helpful in resolving the question before us520 East 81st St. Assoc. v. New York, 99 N.Y.2d 43, 750 N.Y.S.2d 833, 780 N.E.2d 518, 521 (N.Y. 2002) (granting requested interest in a takings case on the ground that the disputed interest amount was "not an award of prejudgment interest on a liquidated sum in the traditional sense," but instead "a measure of the rate of return on the property owner's money" required for just compensation).
 
 
 [10]
 A few courts have granted prejudgment interest under § 5001 on prejudgment payments, but they have done so without addressing the basis for doing it, or the application of § 5001 to such a situationSee Lupoli v. Venus Labs., Inc., 287 A.D.2d 488, 731 N.Y.S.2d 217, 218 (2nd Dept. 2001) (modifying the interest award on a settlement payment to eliminate post-settlement-interest, but retaining the pre-settlement award); Oy Saimaa Lines Logistics Ltd. v. Mozaica-New York, Inc., 193 F.R.D. 87, 90-91 (E.D.N.Y.2000) (awarding prejudgment interest on sums already paid that were overdue for a year and a half before payment); Peachy v. Roszenweig, 215 A.D.2d 301, 626 N.Y.S.2d 784, 784 (1st. Dept. 1995) (calculating interest on the whole of petitioner's award, then subtracting setoff).
 
 
 [11]
 North River's letter brief, however, contained only a footnote on the propriety of awarding prejudgment interest awards on ACE's January 18, 2001 payment. That footnote contained two citations: one, to an inapplicable section of the statute, § 5001(b), which deals only with the starting date for an interest calculation; and the other, to a case,R.B. Williams Holding Corp., 2001 WL 266026, in which, as discussed above, the court deducted payments already made before calculating prejudgment interest.