In the Matter of Proceeding between
NATIONAL BASKETBALL
ASSOCIATION

and

New York Knickerbockers
Basketball Club

and

Robertson Class Plaintiffs and National
Basketball Players Association.

No. 70 Civ. 1526 (RLC).

United States District Court,
S.D. New York.

Feb. 6, 1986.

Proskauer Rose Goetz & Mendelsohn, New York City, for NBA; Jeffrey A. Mishkin, Marc J. Goldstein, Gary B. Bettman, Gen. Counsel, Nat. Basketball Ass'n, of counsel.

Parker Auspitz Neesemann & Delehanty P.C., New York City, for New York Knickerbockers Basketball Club; John M. Delehanty, Charles L. Kerr, Richard H. Zahnd, Kenneth W. Munoz, Madison Square Garden Corp., of counsel.

Weil, Gotshal & Manges, New York City, for Robertson Class Plaintiffs; James W. Quinn, Jeffrey S. Klein, of counsel.

## OPINION

ROBERT L. CARTER, District Judge.

In or about April, 1983, the National Basketball Association ("NBA") and the National Basketball Players Association ("NBPA") jointly applied for an order to modify the 1976 *Robertson* settlement agreement approved by this court in an opinion, *Robertson v. National Basketball Association*, 72 F.R.D. 64 (S.D.N.Y.1976) (Carter, J.), *aff'd*, 556 F.2d 682 (2d Cir. 1977), with which familiarity is assumed. In an affidavit in support of that application, David Stern, then Executive Vice President for Business and Legal Affairs of the NBA, pointed out that escalating expenses had caused NBA teams to suffer serious financial losses. He cited players' salaries and benefits as the chief factors in increasing the financial burden of operating an NBA franchise. Stern stated that financially weak teams were at a competitive disadvantage since they could not offer talented players salaries commensurate with what they could obtain from teams with greater financial resources. The purpose of the Modification Agreement was, in David Stern's words, "to insure the financial stability of troubled NBA teams, improve competitive balance and at the same time preserve and improve the basic framework of the [*Robertson*] Settlement Agreement." Aff. of David Stern at 3, Ex. 1, Aff. of Gary Bettman.

Lawrence Fleisher, General Counsel for the NBPA, disagreed that increased players' salaries and benefits were the sole, or even the principal, causes of whatever financial setbacks NBA teams might have suffered. However, according to Mr. Fleisher, the players "did recognize that it was in [their] overall best interest to have a financially stable league with as many viable franchises as possible bidding for the

services of NBA players." Aff. of Lawrence Fleisher at 4, Ex. 2, Aff. of Bettman. The essential objectives of the players in negotiating the terms of the Modification Agreement were: (i) "to maintain a system of free agency, which, to the greatest extent possible, would insure that player salaries be established at competitive levels as a result of a free and open bidding system; (ii) to strengthen the long-term financial stability of the league and to protect the jobs of as many players as possible; and (iii) to provide for some form of overall revenue sharing between the players and the NBA teams...." *Id.* at 4–5.

Both sides believed that the agreed modifications met their basic objectives. The features of the agreement relevant here are the imposition of a salary cap on NBA teams and the guarantee that the players would receive salaries and benefits equal to 53 percent of the NBA teams' overall gross revenues.

This unique agreement was approved by the court on June 13, 1983, and will remain in effect through the playoffs at the close of the 1986–87 basketball season. In urging the court to sign the order, James Quinn, counsel for the *Robertson* class, stated "we believe that the agreement will insure league wide stability in regard to its financial impact on the league and the clubs" (Tr. 6–7, June 13, 1983 proceeding). Jeffrey Mishkin, counsel for the NBA, urged court approval in these words: "we recognize, and the players recognize that the maximum team salary necessarily imposes a restriction on the ability of the NBA teams to negotiate and sign player contracts, and the maximum team salary is designed and was intended to impose that kind of a restriction." (*Id.* at 8–9).

The initial representations by Stern and Fleisher clarified the critical issues, and the statements of counsel at the June 13, 1983 hearing indicated that they had been the subject of hard fought, arms-length negotiations. Each party emerged convinced that the resulting agreement fully and adequately protected its fundamental interests, the *sine qua non* for its being a signator to the agreement.

To insure that these hard-won objectives would not be undermined, the Modification Agreement contains an enforcement provision, Article 111 C (9): "Neither the parties hereto, nor any Team or player shall enter into any agreement, Player Contract, Offer Sheet or other transaction which includes any terms that are designated to serve the purpose of defeating or circumventing the intention of the parties as reflected by (a) the provisions of this Modification Agreement with respect to Deferred Gross Revenues, Maximum Team Salary and Minimum Team Salary and (b) those terms and provisions of the Settlement Agreement which remain in full force and effect as provided in Article II, paragraph B above." Pursuant to Article IV A (2), all disputes arising under this paragraph were to be referred to the Special Master.

Against that background, I approach the issue at hand recognizing that when this agreement was negotiated, signed and approved in 1983, both parties sought to put in place iron-clad team salary restrictions and procedures for revenue sharing between the players and franchise owners. The Special Master was given the vital role of preserving the integrity of their agreement by preventing erosion of the basic interests which each party had sought through the modification.

The facts that give rise to the instant controversy are not in dispute. When the New York Knickerbockers ("Knicks"), were over the maximum team salary limitation imposed by Article III of the Modification Agreement, they made an offer to Albert King, a player with the New Jersey Nets. The salary cap barred the Knicks from offering a salary to any new player unless one of the salary cap exceptions provided in Article III C(2) (a)–(g) of the Modification Agreement was applicable.

Only two of these exceptions are pertinent to this case. Under Article III, C (2)(c)(i) a team at or over the maximum team salary may replace "a player who retires" at a salary no greater than 50

percent of the salary "last paid to the player being replaced." Under Article III C(2)(e) a team at or over the maximum team salary may replace a Veteran Free Agent with a new player at "a salary no greater than 100 percent of the salary last paid the Veteran Free Agent."

Leonard Robinson, an 11 year NBA veteran, who had been playing with the Knicks for three years at the close of the 1984–85 season, did not seek to renew his contract for the 1985–86 season. His annual salary for the 1984–85 season had been $540,000. The question for the Knicks, therefore, was whether the offer sheet could be presented pursuant to Article III, C(2)(c)(i) at half Robinson's salary or $270,000 per year, or under Article III, C(2)(e) at 100 percent of Robinson's salary or $540,000 per year.

The Knicks took the view that Robinson was a Veteran Free Agent, enabling them to offer Albert King 100 percent of Robinson's last salary. On that assumption, the initial offer sheet to King contained a signing bonus of $400,000 and five years of guaranteed salary as follows: 1985–86— $450,000; 1986–87—$450,000; 1987–88— $600,000; 1988–89—$700,000; $1989–90— $700,000.

Under Article III C(7) a signing bonus is allocated, pro rata, over the number of "guaranteed" salary seasons covered by the contract. Thus, the $400,000 bonus to King was to be allocated at the rate of $80,000 per year for the five years guaranteed. The proposal enabled the Knicks to offer King $530,000 for each of the first two years of the contract, keeping the offer under the $540,000 salary last paid to Robinson. Since the termination date of the agreement was the 1986–87 basketball season, the offer sheet was within the salary cap during the life of the agreement.

The NBA, however, took the position that the Knicks could offer King only 50 percent of Robinson's last salary since in its view Robinson was a retiree, not a Veteran Free Agent. The NBPA took the Knicks' side. Article III C (2) (e)(ii) and Article IV A (3) provide that when the NBA and the NBPA disagree as to which salary cap exception applies in a particular case the dispute must be referred to an "Impartial Basketball Expert" designated by the parties.

William Cunningham, a prominent former player and coach, was named by the NBA and NBPA to decide the dispute. He held a hearing on October 18, 1985. Cunningham ruled on October 21, 1985, that Robinson was a retiree, and not a Veteran Free Agent. This decision left the Knicks with only $270,000 a year to offer King during the life of the agreement.

Faced with Cunningham's decision, on or about October 24, 1985, the Knicks revised their offer sheet. The new proposal contained a signing bonus of $960,000, and five years of guaranteed salary as follows: 1985-86—$75,000; 1986-86—$75,000; 1987-88—$700,000; 1988-89—$700,000; 1989-90—$800,000. With the $960,000 bonus prorated over the five years of guaranteed salary, King's salary for the two years covered by the Modification Agreement was to be $267,000. This figure falls under the $270,000 permitted by the retired player exception to the salary cap. Thereafter, his salary was to increase some 300 percent and more for the final three years of the contract.

The NBA invoked Article III C (9), contending that this offer constituted a device to circumvent or defeat the parties' intent in respect of the team salary cap provision in the Modification Agreement. The matter went before Special Master Kingman Brewster on November 2, 1985. David DeBusschere, the general manager of the Knicks, Kenneth Munoz, Assistant General Counsel, Madison Square Garden, and Lawrence Fleisher, General Counsel, NBPA, testified at the hearing, and argument was presented by counsel for the parties.

DeBusschere testified that the Knicks and their lawyers discussed how to make an offer to King within the parameters of the agreement. Negotiations between King and the Knicks ended in a guaranteed five year contract totalling $3.3 million. Before Cunningham's decision, the Knicks

proceeded on the theory that they were free to offer King a salary of $540,000 a year, and they structured the offer sheet to King on that basis.

Speculating that the retiree, rather than the Veteran Free Agent, exception might be held applicable, the offer sheet under attack here also came under discussion. However, no formal offer containing these terms was made to King until after Cunningham's determination. The second offer sheet was structured to provide for aggregate gross compensation of $3.3 million, as was the initial offer sheet, and terms were modified to bring the offer sheet into technical compliance with the Modification Agreement.

The Special Master perceived no violation of the Modification Agreement. He defined the basic question to be whether an "outsize bonus with a subsize salary constitute[s] terms that are designed to serve the purpose of defeating or circumventing the intention of the parties in agreeing to the Modification Agreement?" In answering that question the Special Master relied on the ruling of Arbitrator Stark in an arbitration concerning Jim Paxson. There the arbitrator held that although the question of circumvention was expressly left to the Special Master, an outsize bonus was within the terms of the Modification Agreement. The Special Master also felt that the NBA's prior acquiescence to a team's use of an outsize bonus to achieve formal compliance with the maximum team salary limitations supported the arbitrator's view that the Modification Agreement was "written to cover 'any signing bonus' without restrictions of any kind."

He concluded that, as the expiration of the agreement approaches, "the ability to use signing bonuses to *offset low initial salaries* reduces the coercion effect of the salary cap. A remedy for this is best left to the process of negotiation, however. To expect the Special Master to decide when a bonus is so high or an initial salary so low as to amount to circumvention within the meaning of Article III C (9) would be as difficult for him to administer as it would

be for players and clubs to outguess." Therefore, he held, the second offer sheet to King did not violate Article III C (9) or any related portion of the Modification Agreement. Dissatisfied with that ruling, the NBA brought the matter here.

**Determination**

The events and circumstances of this case present a stark case of intentional circumvention. If the court were to let it stand, the Special Master's determination would eviscerate the salary cap limitation for the final years of the Modification Agreement, and undermine the NBA's purpose in signing the agreement. Therefore, the Special Master's ruling is reversed.

I recognize that this is a judgment call. While this case does not seem particularly difficult, succeeding cases may present the perplexities foreseen by the Special Master. However, it is the business of the Special Master and the court to draw lines and to make distinctions. It is the traditional and accepted function of courts to accomplish tasks of this kind on a case by case determination.

The basic issue in this case is not whether the initial bonus is surprisingly large or the initial salary is ridiculously small—although these matters are surely implicated—but whether the structure of the offer sheet to King nullifies a vital ingredient of the Modification Agreement, the maximum team salary limitation. I am certain it does, and, therefore, do not have the problem voiced by the Special Master.

The critical underpinnings of the Modification Agreement were the maximum and minimum team salary limitations and the revenue sharing provision. The agreement could not have come into being without those stipulations. The NBA wanted a maximum team salary limitation. The NBPA sought to protect the players from any permanent adverse effects pursuant to the agreed on salary cap with a minimum team salary provision and a revenue sharing mandate. This *quid pro quo* formed the heart of the Modification Agreement. The parties took pains to provide for con-

tingencies and play within these provisions without destroying them.

The Special Master's and the court's oversight of the integrity of the agreement gives us the task of effectuating the parties' purpose and objectives in coming to terms. *Cromwell Towers Redevelopment Co. v. City of Yonkers*, 41 N.Y.2d 1, 390 N.Y.S.2d 822, 826, 359 N.E.2d 333 (1976) ("[a] fair and reasonable interpretation, consistent with that [the parties'] purpose, must guide courts in enforcing the agreement"). *New York Bank for Savings v. Howard Cortlandt St., Inc.*, 106 A.D.2d 496, 482 N.Y.S.2d 836 (2d Dept.1984) ("[i]n construing a contract, a focal point of inquiry must be the objective of the contract and the purpose of the parties"); *Rock Transport Properties Corp. v. Hartford Fire Ins. Co.*, 312 F.Supp. 341 (S.D.N.Y.) (MacMahon, J.) *aff'd*, 433 F.2d 152 (2d Cir. 1970) ([t]he parties' "manifested purpose" controls the interpretation of the contract provisions); *Tougher Heating & Plumbing Co., Inc. v. State of New York*, 73 A.D.2d 732, 423 N.Y.S.2d 289 (3d Dept.1979) ("a fair and reasonable interpretation consistent with [the parties'] purpose must guide in enforcing the agreement"); *Pittsburgh Coke & Chemical Co. v. Boiler*, 421 F.Supp. 908, 928 (E.D.N.Y.1976), *aff'd*, 560 F.2d 1089 (2d Cir.1977) ("in construing the provisions of a contract, we should give due consideration to the circumstances surrounding its execution, to the purpose of the parties in making the contract, and, if possible, we should give to the agreement a fair and reasonable interpretation").

Each part of a written agreement should be interpreted to effectuate its overall purpose. *Weiss v. Weiss*, 52 N.Y.2d 170, 436 N.Y.S.2d 862, 418 N.E.2d 377 (1981); *New York Bank for Savings v. Howard Cortlandt St. Inc., supra; Hawes Office Systems, Inc. v. Wang Laboratories, Inc.*, 524 F.Supp. 610, 614 (E.D.N.Y.1981) (a court must give all the provisions of a contract a reasonable meaning rather than interpret the agreement in a way which renders a provision useless or inexplicable); *Browning-Ferris Industries of New York, Inc. v. County of Monroe*, 103 A.D.2d 1040, 478 N.Y.S.2d 428, 430 (4th Dept.1984), *aff'd*, 64 N.Y.2d 1046, 489 N.Y.S.2d 902, 479 N.E.2d 247 (1985) (a contract must be construed so that meaning and effect is given to every provision, and unfair and anomalous results are to be avoided); *Tougher Heating and Plumbing Co., Inc. v. State of New York, supra*, 423 N.Y.S.2d at 291 ("every part of a contract should be interpreted to give effect to its general purpose. Where ... a literal construction defeats and contravenes" that purpose, it must be rejected); *Schulman Investment Co. v. Olin Corp.*, 477 F.Supp. 623, 628 (S.D.N.Y.1979) (Tenney, J.) (each provision of a contract must be read to effectuate its central purpose).

Courts, however, should not under the guise of interpretation make a new contract for the parties which is at odds with the express language in the agreement. *Robertson v. NBA*, 479 F.Supp. 657, 669 (S.D.N.Y.1979) (Carter, J.), *aff'd in part and rev'd in part on other grounds*, 625 F.2d 407 (2d Cir.1980). Nor, in the absence of fraud or other overreaching, is it the court's function to rewrite improvident or inequitable provisions of a contract. *International Union of Electrical & Machine Workers, AFL–CIO v. General Electric Co.*, 337 F.Supp. 817, 821 (S.D.N.Y.1972) (Pollack, J.). However, where a contract is designed to protect the interests of both parties, the objective of interpretation is to sacrifice the principal interests of each party as little as possible, *Sharon Steel Corp. v. Chase Manhattan Bank*, 691 F.2d 1039, 1051 (2d Cir.1982), *cert. denied*, 460 U.S. 1012, 103 S.Ct. 1253, 75 L.Ed.2d 482 (1983), and to avoid a result which places one party at the mercy of the other. *Lowy and Donnath, Inc. v. City of New York*, 98 A.D.2d 42, 469 N.Y.S.2d 760, 762 (1st Dep't 1983), *aff'd* 62 N.Y.2d 746, 476 N.Y.S.2d 830, 465 N.E.2d 369 (1984).

With these principles in mind, we proceed to decide the case at hand. The Knicks were over the maximum team salary cap when they sought to place King under contract. The club made an offer to King on the theory that Robinson would be regard-

ed as a Veteran Free Agent. With the bonus of $450,000 allocated on a pro rata basis over the guaranteed five years, the first offer including the salary and pro rated bonus provided a realistic compensation for 1985–86 and 1986–87 for a player of King's talents. The third, fourth and final years of the contract with salary and bonus were over the Knicks' salary cap under this agreement. However, the agreement was scheduled to terminate in the spring of 1987.

The total package came to $3.3 million. When faced, however, with the arbitrator's decision, which limited their offer to King to half of what they hoped would be permitted, the Knicks did not reduce the amount of the total $3.3 million package. The offer sheet was merely restructured to provide what the Special Master describes as an outsize bonus and subsize salary for the two remaining years of the agreement; the salary leaps upward approximately 300 percent once the agreement lapses.

My own view is that the initial offer sheet violated the contract. If one pro rates the bonus over the years of guaranteed salary, only the first two of the proposed contract years fall under the salary cap. The imbalance in the initial offer would have been $140,000 over the salary cap in the third year and $240,000 over the cap in the fourth and fifth years if Robinson had been declared a Veteran Free Agent. These are modest infractions compared to the gross imbalance of the second offer. The second offer renders distinction between the retiree and veteran free agent exceptions meaningless and provides an utterly unrealistic compensation for the first two years of the proposal. The integrity of the agreement is, therefore, shattered.

A rough guide for the Special Master is to determine whether an offer sheet comes within the requisite salary cap for each of the guaranteed years. If it does, it is in keeping with the agreement. If it does not, it circumvents the agreement unless the party claiming compliance presents justifying reason and circumstance to warrant a contrary conclusion.

It is true that the parties placed no limitations on the size of a bonus that could be offered. It is also true that they allowed bonuses to be allocated pro rata over the guaranteed years of a contract. In this way, teams at the maximum team salary cap retain some needed leeway. But as a consequence, offers such as the one in dispute here seem plausible to lawyers—if not to laymen—since there is artificial conformity in the closing years of the agreement. If the agreement had five years remaining, this disingenuous appearance of compliance would have been foreclosed, since the compensation offered would have to come within the salary cap for five years, not two. The Special Master should not have utilized NBA approval of prior bonus pro rated allocations as within the salary cap as justification for the result he reached in this case. This agreement cannot work unless each side allows the other some flexibility. That, however, does not validate egregious disregard of the agreement such as that here.

The salary cap restriction was an integral part of the bargain to which the NBPA agreed in order to secure revenue sharing for players and a minimum salary floor. The players cannot be allowed to structure salary contracts which, although artifically and formally within the salary cap limitations, void the provisions designed to protect the NBA's interests. By sanctioning such empty formalism we would buttress the players' interests, but leave the league's in shambles. This was a two sided agreement when approved in 1983, and the parties entrusted the court with maintaining it as such until termination.

The matter is remanded to the Special Master to determine, in conformity with this opinion, what relief is appropriate.

IT IS SO ORDERED.