TIG INSURANCE COMPANY, successor by Merger to International Insurance Company, Plaintiff,

v.

NEWMONT MINING CORPORATION, Defendant.

No. 04 Civ. 4105(SAS).

United States District Court,
S.D. New York.

Nov. 8, 2005.

William C. Rogers, Thelen Reid & Priest LLP, San Francisco, California, for Plaintiff.

Robert L. Tofel, Tofel & Partners LLP, New York, New York, for Defendant.

## OPINION AND ORDER

SCHEINDLIN, District Judge.

TIG Insurance Company ("TIG") brings this action for breach of contract and declaratory judgment against Newmont Mining Company ("Newmont"). TIG alleges *first*, that Newmont unreasonably withheld a portion of a settlement recovery owed to TIG, and *second* that Newmont owes interest to TIG on certain late payments.[1] A bench trial was held from October 7, 2005 to October 14, 2005. The Court has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332. Venue is proper in this district pursuant to 28 U.S.C. § 1391(a). The following constitutes the

---

1. On October 4, 2005, this Court issued an Opinion and Order denying a motion in limine by Newmont to preclude TIG from claiming that it is entitled to interest as damages for untimely payments. *See TIG Ins. Co. v. Newmont Mining Corp.*, No. 04 Civ. 4105, 2005 WL 2446234 (S.D.N.Y. Oct. 4, 2005) ("Interest Opinion").

Court's findings of fact and conclusions of law.

## I. FINDINGS OF FACT

### A. The Parties[2]

TIG is a California corporation with its principal place of business in Irving, Texas. TIG is the successor by merger to International Insurance Company ("International"). During the early 1980s, International issued certain Environmental Impairment Liability insurance policies to Newmont. Newmont is a Delaware corporation with its principal place of business in Denver, Colorado.

### B. The Idarado and Resurrection Mining Sites

Significant mining began at the Idarado and Resurrection sites in Colorado after the Civil War.[3] Two Newmont subsidiaries, Idarado Mining Company and Resurrection Mining Company, conducted operations at these sites during the twentieth century.[4] In the 1980s, the State of Colorado brought actions against Newmont related to environmental contamination at Idarado and Resurrection.[5] Newmont claims that it incurred approximately seventy five to eighty million dollars in total costs related to these actions.[6] Subse-

quently, Newmont became involved in lawsuits with International and various of its comprehensive general liability insurers ("CGL Insurers") over coverage for these claims.[7]

### C. The Agreement

On February 1, 1995, International and Newmont executed a settlement agreement resolving their coverage dispute (the "Agreement").[8] The Agreement required International to pay $18,500,000 to Newmont by February 2, 1995.[9] This sum was paid.[10] In turn, Newmont was to remit to International twenty percent of any net recovery from the CGL Insurers "with respect to coverage for environmental claims involving the Idarado and/or Resurrection sites."[11]

The Agreement gives Newmont "the sole right, without interference" to settle its actions with the CGL insurers "in such manner as Newmont believes to be appropriate."[12] Newmont is charged with determining the "gross amount(s) received from any CGL Insurer with respect to environmental claims involving the Resurrection or Idarado Sites."[13] The Agreement does not provide any remedies for International in the event that it disputes

---

2. The facts regarding the parties are taken from the Joint Pretrial Order ("JPO"). Unless otherwise noted, all facts taken from the JPO are undisputed.

3. Trial Transcript ("Tr.") at 35, 107 (Michael Fayerweather Aylward, Insurance Law Expert for TIG), 314 (William J. Russell, Insurance Law Expert for Newmont).

4. The Idarado Mining Company was formed in 1939. *See id.* at 49, 107 (Aylward). The record does not indicate when the Resurrection Mining Company was formed.

5. *See* JPO at 2.

6. *See* Tr. at 36 (Aylward).

7. *See id.*

8. *See* Settlement Agreement and Mutual Releases, Plaintiff's Exhibit ("Pl.Ex.") 2 and Defendant's Exhibit ("Def.Ex.") A.

9. *See* Agreement ¶ 1.

10. *See* JPO at 2.

11. Agreement ¶ 4.

12. *Id.* ¶ 9.

13. *Id.* ¶ 10.

Newmont's calculation of this amount.[14]

Before calculating International's twenty percent share of Newmont's recoveries from CGL Insurers, the Agreement allowed Newmont to deduct fees and expenses "incurred in connection with *any* litigation between Newmont and any CGL Insurer ... involving the Idarado or Resurrection sites."[15] Newmont could deduct fees and expenses from an action even if no recovery had been obtained in that action.[16] Newmont was required to certify the amount of its deductible fees and expenses, and International was entitled to review Newmont's underlying bills for sixty days thereafter.[17] Additionally, for ninety days after Newmont's final payment under the Agreement, International had the right to seek review of Newmont's fees and expenses for "mathematical errors" by a "Referee."[18] If the Referee found that "any fees and expenses incurred for purposes other than litigation with a CGL Insurer with respect to the Idarado and Resurrection sites were deducted by Newmont," Newmont would be required to pay any amounts due to International, plus an additional ten percent.[19]

Payments became due to International when Newmont recovered settlement proceeds in excess of its fees and expenses on February 1, 1996, December 31, 1996, and each June 30 and December 31 thereafter.[20] The Agreement required Newmont to "periodically" deliver to International copies of documents filed in its actions against the CGL Insurers.[21] The Agreement is silent on the question of interest on any late payments from Newmont to International.[22] In the event of litigation, the Agreement allows costs and attorney's fees to the prevailing party.[23]

## D. The Lloyds/North River Settlement

Underwriters at Lloyds of London, certain London Market Insurance Companies, and North River Insurance Company (collectively, "Lloyds/North River") had issued excess and umbrella policies[24] to Newmont, covering occurrences from 1952 to 1968 and 1979 to 1984,[25] with limits totaling at least $250 million.[26] In 1993, Newmont brought suit in Colorado against Lloyds/North River and various other CGL Insurers for coverage related to the

14. The Agreement provides only that Newmont will use reasonable best efforts to obtain consent from the CGL Insurer to disclose the terms of settlements to International "for the purposes of allowing International to verify the amounts received by Newmont in settlement." *Id.* ¶ 13.

15. *Id.* ¶ 10 (emphasis added).

16. *See id.*

17. *See id.*

18. *Id.* ¶ 11.

19. *Id.*

20. *See id.* ¶ 10.

21. *Id.* ¶ 8.

22. The Agreement provided for interest at the rate of nine percent per annum in the event that TIG's payment to Newmont was late. *See id.* ¶ 1.

23. *See id.* ¶ 12.

24. Tr. at 42 (Aylward), 309 (Russell). Excess and umbrella policies cover claims that exceed the limits of the policies in the primary layer of insurance. *See id.* at 43 (Aylward).

25. *See id.* at 25 (Aylward).

26. *See id.* at 99 (Aylward). Russell testified that certain of the policies issued by Lloyds/

Idarado and Resurrection sites (the "Colorado CGL Action").[27]

Prior to trial in the Colorado CGL Action, Newmont had incurred approximately sixty million dollars in unreimbursed costs related to the Idarado and Resurrection sites.[28] During the summer of 1997, Newmont made a settlement offer to Lloyds/North River "in the tens of millions of dollars."[29] Newmont's offer was based on the "all sums theory" of allocation.[30] On this theory, when a loss occurs over more than one year and there are multiple insurers, the loss is allocated to a single year, insurers are jointly and severally liable, and insurers may be able to seek contribution from one another.[31] Lloyds/North River countered Newmont's demand with an offer of $900,000, and suggested that they would pay more if the settlement included a "buy back" of all policies issued by Lloyds/North River to Newmont.[32] The parties did not reach a settlement at that time.[33]

When the trial in the Colorado CGL Action began on November 3, 1997, Judge Robert P. Fullerton ruled that *first,* the all sums approach of joint and several liability did not apply to the facts of the case, and *second,* the jury would be asked to allocate damages by occurrence to "policy years and also prepolicy years, because . . . the court does not deem that it would be fair to require these insurers to pay for damages that occurred before their policies were in effect."[34] If the jury was not able to allocate damages, the court would apply the "time on the risk approach."[35] Under this theory of allocation, total damages are divided by the number of years in which they occurred, and an insurer's payment is determined by multiplying this number by the number of years that insurer was "on the risk."[36] Newmont considered Judge Fullerton's ruling to be "very adverse" to its position with respect to the value of its Idarado and Resurrection claims.[37] In Newmont's assessment, Judge Fullerton's ruling created the risk that damages would be divided over a century of mining operations.[38] Applying the time on the risk analysis, damages for any one year might not have reached the minimum threshold to trigger coverage under the Lloyds/North River policies.[39]

Prior to a jury verdict, Lloyds and Newmont reached a settlement in principle.[40] On December 12, 1997, Newmont and Lloyds/North River executed a settlement agreement and release ("Lloyds/North River Agreement") resolving the pending litigation as well as releasing Lloyds/North River from all obligations under certain

---

North River did not have aggregate limits. *See id.* at 309 (Russell).

27. *See* JPO at 2, 4.

28. *See* Tr. at 39 (Aylward).

29. *Id.* at 231 (Joy E. Hanson, Former General Counsel to Newmont). *Accord id.* at 128 (John McAndrews, Former Counsel to Lloyds/North River).

30. *See id.* at 232 (Hanson).

31. *See id.* at 44 (Aylward), 310 (Russell).

32. *See* Stipulation, Def. Ex. 77, Tr. at 224.

33. *See* Tr. at 232 (Hansen).

34. 11/3/97 Transcript of Hearing before Hon. Robert P. Fullerton, Pl.Ex. 10, Def. Ex. WWW ("Fullerton Tr.") at 941.

35. *Id.*

36. *See* Tr. at 45 (Aylward), 311–12 (Russell).

37. *Id.* at 234 (Hansen).

38. *See id.* at 246 (Hansen).

39. *See id.* at 247 (Hansen). The Lloyds/North River policies only covered losses in excess of $500,000. *See id.* at 316 (Russell) ("the lowest Lloyds underlying limit is $500,000").

40. *See id.* at 36, 38 (Aylward).

policies issued to Newmont.[41] Newmont eventually received a total of $6,038,109 pursuant to the Lloyds/North River Agreement.[42]

To calculate the amount owed to International on account of this settlement, Newmont allocated approximately twenty percent, or $1,200,000, to settlement of claims involving the Idarado and Resurrection sites, and the balance to the policy buy back.[43] Newmont based its allocation in part on the fact that prior to Judge Fullerton's favorable ruling for Lloyds/North River, Lloyds/North River had made a settlement offer, excluding any buy back, of "around $1 million."[44] In Newmont's assessment, the buy back extinguished any potential coverage Newmont might have had for environmental costs related to mining operations such as Dawn Mining, near Spokane, Washington, and Pinal Creek, near Phoenix, Arizona.[45] Internally, Newmont divided the settlement amount between its subsidiaries and the parent corporation in accord with this 20%/80% allocation.[46] The Lloyds/North River Agreement does not speak to the question of allocation, and Lloyds/North River did not dictate that Newmont make any particular allocation.[47] Newmont deducted 100% of its fees and expenses related to the Lloyds/North River Agreement, because it considered the expenses incurred to negotiate the buy back and to settle claims involving the Idarado and Resurrection sites, such as the costs of travel to London, to be "overlapp[ing]."[48]

TIG alleges that Newmont improperly withheld amounts of the Lloyds/North River settlement from its calculation.[49] TIG claims damages for this breach in the amount of $960,000 (twenty percent of $4.8 million).[50] Thus, TIG claims that the entire Lloyds/North River settlement should be allocated to the settlement of the Idarado and Resurrection sites.

### E. Late Payments by Newmont to International and TIG

The parties have stipulated that Newmont received a total of $17,265,000 in settlement funds from certain CGL Insurers with respect to the Idarado and Resurrection sites prior to December 31, 1997.[51] Deductible fees and expenses as of that date were equal to or less than $11,841,152.93, the amount Newmont certified it had incurred as of June 5, 1998.[52] Therefore, at least $1,084,769.41 (twenty percent of the net settlement recovery of $5,423,847.07) was due to International un-

---

41. *See* Confidential Settlement Agreement and Release, Pl.Ex. 20, Def. Ex. ZZZ.

42. *See* JPO at 4–5.

43. *See id.*

44. Tr. at 244 (Hansen).

45. *See id.* at 239–40 (Hansen).

46. *See id.* at 268–73 (Blake Rhodes, Former Assistant General Counsel to Newmont); 1/22/98 Draft by Rhodes, Pl.Ex. 21, Def. Ex. Z; 1/22/98 Draft by Rhodes, Pl.Ex. 22, Def. Ex. AA.

47. *See* Tr. at 273 (Rhodes).

48. *Id.* at 241 (Hansen). TIG did not allege at trial that it was entitled to damages for any expenses which may have been improperly deducted.

49. *See* TIG Insurance Company's Post–Trial Brief ("TIG Brief") at 2.

50. *See id.*

51. *See* JPO at 4.

52. *See id.* at 5. TIG claims that the exact amount of deductible fees and expenses as of that date was less than this number. *See* TIG Brief at 12 n. 7. Because TIG adduced no evidence at trial to support its calculation, this Court must rely on the stipulated facts.

der the Agreement on December 31, 1997. Newmont made no payment and sent no notice to International on that date. On February 2, 1998, Newmont informed International that it had reached settlements totaling approximately $20 million, but that "not all of the settlements have been paid." [53] Newmont also stated that its expenses were "very near $12 million." [54] On April 3, 1998, International requested an update on the status of Newmont's settlements and the opportunity to review supporting documents. [55]

On June 5, 1998, Newmont paid $1,500,000 to International. [56] Newmont certified that, as of that date, it had collected a gross amount of $19,665,000 from CGL Insurers involving the Resurrection and Idarado sites. [57] Twenty percent of the net recovery is $1,564,769.41. Newmont withheld $64,769.41 to reserve for "anticipated future costs and expenses." [58] Newmont did not disclose the dates it had collected its settlement recoveries at that time, and International accepted payment without waiver of its rights in connection with the Agreement. [59]

Prior to June 30, 2002, Newmont collected an additional $2,600,000 from CGL Insurers with respect to the Idarado and Resurrection sites. [60] On June 17, 2003, Newmont paid $472,000 to International. [61] On September 10, 2003, Newmont certified that as of June 17, 2003, it had incurred $239,602.39 in deductible expenses. [62] Twenty percent of the net amount is $472,079.52. Newmont "round[ed]" that number to $472,000 when it made its June 17, 2003 payment. [63]

On April 28, 2005, Newmont paid $64,848.87 to TIG on account of sums previously unpaid in June 1998 and June 2003. [64] TIG alleges that it suffered damages in the amount of interest on those late payments. [65]

## II. APPLICABLE LAW

### A. Breach of Contract

■ To establish a claim for breach of contract under New York law, TIG must prove, "(1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages." [66] The

---

**53.** 2/2/98 Letter from Robert L. Tofel, Counsel to Newmont, to Mitchell S. Cohen, Local Counsel to International ("2/2/98 Letter"), Pl. Ex. 23, Def. Ex. B at 1. Although James Riddle, not Mitchell Cohen, was the party designated to receive notices under the Agreement, James Riddle acknowledged timely receipt of a copy of the 2/2/98 Letter. *See* 2/10/98 Letter from James Riddle, Counsel to International to Rhodes, Pl.Ex. 24, Def. Ex. C.

**54.** 2/2/98 Letter at 1.

**55.** *See* 4/3/98 Letter from Riddle to Tofel, Pl. Ex. 25, Def. Ex. D.

**56.** JPO at 5.

**57.** *See id.*

**58.** 6/4/98 Letter from Tofel to Riddle at Pl.Ex. 26, Def. Ex. E at 2.

**59.** *See* 6/16/98 Letter from Riddle to Tofel, ("6/16/98 Letter") Pl.Ex. 27, Def. Ex. F ("In-

ternational must continue to reserve all of its rights in connection with the Agreement and [ ] International's acceptance of the check ... should not be construed as a waiver or release of any such rights.").

**60.** *See* JPO at 5.

**61.** *See id.* at 5–6.

**62.** *See id.* at 5.

**63.** 6/17/03 Letter from Tofel to William C. Rogers, Counsel to TIG ("6/17/03 Letter"), Pl.Ex. 42, Def Ex. V.

**64.** *See* JPO at 6.

**65.** *See* TIG Brief at 2–3.

**66.** *Terwilliger v. Terwilliger*, 206 F.3d 240, 245–46 (2d Cir.2000) (quotation marks omitted).

party asserting a breach of contract claim "has the burden of proving the material allegations in the complaint by a fair preponderance of the evidence." [67]

In determining a party's obligations under a contract, it is not for the court to "supply a specific obligation the parties themselves did not spell out." [68] "Nor, in the absence of fraud or other overreaching, is it the court's function to rewrite improvident or inequitable provisions of a contract." [69]

■ However, "[i]mplicit in all contracts is a covenant of good faith and fair dealing in the course of contract performance. . . . Where the contract contemplates the exercise of discretion, this pledge includes a promise not to act arbitrarily or irrationally in exercising that discretion." [70] One party's discretion cannot "go so far as to enable the party to eviscerate [a] term [of the contract] and frustrate a fundamental purpose underlying the agreement." [71] To prove breach of the implied covenant of good faith and fair dealing, the plaintiff must establish that " 'the defendant sought to prevent performance of the contract or to withhold its benefits from the plaintiff.' " [72]

## B. Statute of Limitations

■ New York has a six-year statute of limitations for an action to recover damages for breach of contract. [73] "[A] cause of action accrues and the statute of limitations begins to run in contract actions from the time of the breach . . . when the plaintiff possesses a legal right to demand payment." [74] But " '[o]ur courts have long had the power, both at law and equity, to bar the assertion of the affirmative defense of the Statute of Limitations where it is the defendant's affirmative wrongdoing . . . which produced the long delay between the accrual of the cause of action and the institution of the legal proceeding.' " [75] "The equitable bar to a defense may arise

---

67. *V.S. Int'l, S.A. v. Boyden World Corp.*, 862 F.Supp. 1188, 1195 (S.D.N.Y.1994).

68. *Tonking v. Port Auth. of N.Y. and NJ*, 3 N.Y.3d 486, 490, 787 N.Y.S.2d 708, 821 N.E.2d 133 (2004). *Accord Teachers Ins. and Annuity Ass'n of America v. Wometco Enters., Inc.*, 833 F.Supp. 344, 349 (S.D.N.Y.1993) (court refused to rewrite contract to insert provision to prevent plaintiff from unreasonably withholding consent where contract was negotiated at arms length and "neither of the parties saw fit to insert" such a provision); *Refinemet Intern. Co. v. Eastbourne N.V.*, 815 F.Supp. 738, 743 (S.D.N.Y.1993) (refusing to insert clause allowing parties to sever certain obligations from others under the contract).

69. *Matter of Nat'l Basketball Ass'n*, 630 F.Supp. 136, 140 (S.D.N.Y.1986).

70. *Dalton v. Educational Testing Serv.*, 87 N.Y.2d 384, 389, 639 N.Y.S.2d 977, 663 N.E.2d 289 (1995).

71. *Power Travel Int'l, Inc. v. American Airlines, Inc.*, 257 F.Supp.2d 701, 706 (S.D.N.Y. 2003) (analyzing law of several jurisdictions).

72. *Dweck Law Firm, L.L.P. v. Mann*, 340 F.Supp.2d 353, 358 (S.D.N.Y.2004) (quoting *Aventine Inv. Mgmt., Inc. v. Canadian Imperial Bank of Commerce*, 265 A.D.2d 513, 697 N.Y.S.2d 128, 130 (2d Dep't 1999)).

73. *See* N.Y. C.P.L.R. § 213(2).

74. *Albany Specialties v. Shenendehowa Cent. Sch. Dist.*, 307 A.D.2d 514, 763 N.Y.S.2d 128 (2003). *Accord Simcuski v. Saeli*, 44 N.Y.2d 442, 448–49, 406 N.Y.S.2d 259, 377 N.E.2d 713 (1978) ("It is the rule that a defendant may be estopped to plead the Statute of Limitations where plaintiff was induced by fraud, misrepresentations or deception to refrain from filing a timely action.").

75. *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, No. 96 Civ. 7233, 2005 WL 756859, at *3 (S.D.N.Y. Apr. 1, 2005) (quoting *General Stencils v. Chiappa*, 18 N.Y.2d 125, 128, 272 N.Y.S.2d 337, 219 N.E.2d 169 (1966)).

by virtue of positive acts, or omissions where there was a duty to act."[76] "If a plaintiff possesses sufficient knowledge of the possible existence of a claim, he or she is under a duty to make inquiry and ascertain all the relevant facts before the statute of limitations expires."[77] This Court has already described the law applicable to damages for untimely payments in its Interest Opinion, and familiarity with that Opinion is assumed.

## C. Prevailing Party

To determine the prevailing party entitled to fees and expenses under the Agreement, this Court must first analyze "the true scope of the dispute litigated" and then compare "what each party achieved within that scope."[78] The prevailing party need not prevail on every one of its claims.[79]

## III. CONCLUSIONS OF LAW

### A. Allocation of the Lloyds/North River Settlement

#### 1. Newmont's Obligations Under the Agreement

■ The parties do not dispute the existence of the Agreement and TIG's performance thereunder. The principal issue is whether Newmont's allocation of the proceeds of the Lloyds/North River settlement was a breach of the Agreement. The Agreement requires Newmont to remit twenty percent of any recovery from a CGL Insurer "with respect to" the Idarado and Resurrection sites to TIG.[80] But the Agreement provides no method for allocating a settlement that is not entirely "with respect to coverage for environmental claims involving" those sites. Neither does the Agreement provide a mechanism for TIG to challenge Newmont's allocation of settlement amounts. International could have reserved such a right through inclusion of appropriate language in the Agreement, just as it secured a mechanism to challenge the fees and expenses deducted by Newmont, but it did not.[81] Therefore, Newmont's allocation of the Lloyds/North River settlement recovery did not directly breach any provision of the Agreement. Because there is no evidence that the Agreement was a result of fraud or overreaching, this Court cannot rewrite the Agreement to provide additional remedies to TIG.[82]

■ However, implied in the Agreement is the covenant of good faith and fair dealing, which prohibits Newmont from exercising its discretion to eviscerate a term of the contract.[83] Therefore, the Court must

---

**76.** *Caprio v. State of New York*, Nos. 103245, M–66272, CM–66383, 2003 WL 21512527, at *2 (N.Y.Ct.Cl. May 28, 2003).

**77.** *Estate of Boyle v. Smith*, 15 A.D.3d 338, 790 N.Y.S.2d 38, 40 (2d Dep't 2005).

**78.** *Botwinick v. Duck Corp.*, 267 A.D.2d 115, 700 N.Y.S.2d 143, 145 (1st Dep't 1999) (citing *Excelsior 57th Corp. v. Winters*, 227 A.D.2d 146, 641 N.Y.S.2d 675, 676 (1st Dep't 1996)).

**79.** *See id.*

**80.** Agreement ¶ 4. TIG interprets the Agreement to require that Newmont remit twenty percent of the entire settlement recovery from any CGL Insurer which in any way "involv[es]" Idarado and Resurrection. TIG

Brief at 4–5. However, the Agreement only requires Newmont to pay "sums collected . . . *with respect to* coverage for environmental claims involving Idarado and/or Resurrection." Agreement ¶ 4 (emphasis added). The policy buyback was not with respect to coverage for claims involving Idarado and/or Resurrection.

**81.** *See id.* ¶¶ 10–11.

**82.** *See Matter of National Basketball Ass'n*, 630 F.Supp. at 140.

**83.** *See Power Travel Int'l, Inc.*, 257 F.Supp.2d at 706.

analyze whether Newmont exercised its discretion in allocating the Lloyds/North River settlement recovery "arbitrarily or irrationally," [84] or in an attempt to withhold the benefits of the Agreement from TIG.[85]

The Court must assess Newmont's allocation under a deferential standard of review. Paragraph 9 of the Agreement forbids TIG from second-guessing Newmont's settlement decisions by giving Newmont the "sole right" to dispose of its actions with CGL Insurers. Any attempt by this Court to re-allocate the proceeds of the Lloyds/North River Agreement would require the type of searching factual inquiry into Newmont's settlement decisions that Paragraph 9 of the Agreement is intended to avoid. In any event, the Court could not determine what percentage of the settlement was "with respect to environmental claims involving" these sites as a factual matter, because there is no objective basis for such an allocation.[86] Newmont's allocation was necessarily a subjective risk assessment and business judgment.

 Cases from the reinsurance context provide guidance on the appropriate framework for analyzing whether Newmont breached the covenant of good faith and fair dealing. Reinsurance disputes often involve settlements between insurers and policy holders based on complicated risk assessments.[87] Under the doctrine of "follow-the-settlements," [88] a reinsurer is required to indemnify an insurer, or cedent,[89] for its settlement with a policyholder as long as that settlement was not fraudulent, in bad faith, or beyond the scope of the policy.[90] "The purpose of the follow-the-settlements doctrine is to prevent the reinsurer from 'second-guessing' the settlement decisions of the ceding company." [91] Otherwise a cedent would never settle with a policyholder for fear that the reinsurer would refuse to reimburse it for that settlement.[92] In *North River Insurance Company v. Ace American Reinsurance Company*, the Second Circuit extended the follow-the-settlements doctrine to prevent reinsurers from second guessing a cedent's post-settlement allocation of indemnification obligations among multiple reinsurers.[93] The reinsurer argued that the cedent had based its allocation on a different theory than the one it relied on in

---

**84.** *Dalton*, 87 N.Y.2d at 389, 639 N.Y.S.2d 977, 663 N.E.2d 289.

**85.** *See Dweck Law Firm, L.L.P.*, 340 F.Supp.2d at 358.

**86.** *See* Tr. at 298 (Russell) (In allocating "an undifferentiated settlement to particular sites," it is possible to "create something that looks like it is a science," but "it probably isn't very precise. The best you can do is try to ... come up with an idea that is a good indication of the right answer.").

**87.** *See, e.g., North River Ins. Co. v. Ace American Reinsurance Co.*, 361 F.3d 134, 138 (2d Cir.2004) (underlying settlement informed by complex computer modeling).

**88.** Outside of the settlement context, this doctrine is referred to as the "follow the fortunes" doctrine. *See id.* at 137 n. 2.

**89.** Insurers are known as cedents with respect to their reinsurance relationships because they cede risk to reinsurers, along with a portion of the premiums. *See Travelers Cas. & Sur. Co. v. Gerling Global Reinsurance Corp. of Am.*, 419 F.3d 181, 183 n. 2 (2d Cir.2005).

**90.** *See, e.g., Christiania Gen. Ins. Corp. v. Great Am. Ins. Co.*, 979 F.2d 268, 280 (2d Cir.1992).

**91.** *Travelers Cas. & Sur. Co.*, 419 F.3d at 186.

**92.** *See id.*

**93.** *See* 361 F.3d at 139 (quotation marks omitted).

negotiating the settlement.[94] The court refused to re-allocate because it would have required precisely the kind of "intrusive factual inquiry" into the cedent's settlement negotiations that the follow-the-settlements doctrine is meant to avoid.[95] By the same token, this Court must afford deference to Newmont's settlement allocation, and analyze the allocation based on whether it was in good faith and reasonable.[96]

## 2. Reasonableness of Newmont's Allocation

TIG has not proven by a preponderance of the evidence, that, in exercising its discretion under the Agreement to make its 20%/80% allocation, Newmont violated the covenant of good faith and fair dealing.[97] Newmont's allocation was one of "several reasonable allocation possibilities."[98] Simply because that allocation reduced the amount of money available to TIG is not a basis for a finding of bad faith.[99] Newmont based its allocation on the history of its settlement negotiations with Lloyds/North River and on Judge Fullerton's adverse ruling.[100] Newmont's allocation method was neither irrational nor arbitrary,[101] but rather, "was reasonable when viewed in the context of then-prevailing case law."[102] Newmont's expert witness, William J. Russell, testified that he reached a similar dollar amount assessment for the value of the Idarado and Resurrection claims[103] using the "orthodox" time on the risk approach and allocating damages pro rata over the entire number of years since mining operations began.[104]

■■■ TIG argues that Newmont's allocation was not credible, but in order to prove that the allocation was done in bad faith, TIG must make an " 'extraordinary showing of a disingenuous or dishonest

94. See id.

95. *Travelers Cas. & Sur. Co.,* 419 F.3d at 189 (citing *North River,* 361 F.3d at 141).

96. See id. (citing *North River,* 361 F.3d at 141) (courts will not "authorize an inquiry into the propriety of a cedent's method of allocating a settlement if the settlement itself was in good faith, reasonable, and within the terms of the policies.").

97. TIG did not allege a violation of the covenant of good faith and fair dealing in its complaint. Because this Court finds that TIG's breach of contract claim was more appropriately a claim for a breach of the covenant of good faith and fair dealing, this Court will analyze the facts accordingly.

98. *Travelers Cas. & Sur. Co.,* 419 F.3d at 189.

99. See id. at 193 (citations omitted) (emphasis in original).

100. See Tr. at 244 (Hansen).

101. See *Dalton,* 87 N.Y.2d at 389, 639 N.Y.S.2d 977, 663 N.E.2d 289.

102. *Travelers Cas. & Sur. Co.,* 419 F.3d at 194.

103. See Tr. at 350–51 (Russell). Russell concluded that based on a time on the risk analysis, Lloyds/North River would have faced a worst case scenario of $2,000,000, which amount would have been discounted in settlement evaluation by more than half based on the chance that coverage defenses could defeat Newmont's claim altogether. See Expert Report of William J. Russell, Def. Ex. XXX at 13.

104. Tr. at 311–12 (Russell). TIG's expert, Aylward, agreed that time on the risk was the appropriate mode of analysis. See id. at 46 (Aylward). However, Aylward believed that damages would be spread throughout years of coverage, or possibly, throughout those years in which Newmont operated the mines. See id. at 107 (Aylward). Aylward agreed that had a jury found that property damage began in the nineteenth century, Newmont would not have had coverage under the Lloyds/North River policies. See id. at 79–80 (Aylward).

failure.' " [105] TIG has not done so. Michael Aylward, TIG's insurance law expert, testified that he had been involved with approximately fifty settlements in which buy backs were negotiated, and that never was a buy back amount more than twenty-five percent of any total settlement. [106] Though Newmont's allocation of eighty percent of the Lloyds/North River settlement to the buy back may be out of step with Aylward's experience, it is possible that the Lloyds/North River Agreement is an unusual case. Aylward testified that generally, the amount that a carrier would pay for a buy back is small because a reinsurer will reimburse a cedent for a settlement of claims, but not a buy back. [107] TIG presented no evidence that Lloyds/North River had reinsurance coverage for these claims.

Aylward also testified that he premised his opinion on his belief that Newmont had not given up any significant coverage through the buyback, other than coverage for the Idarado and Resurrection claims. [108] Aylward discounted the value of a potential Dawn Mining claim against Lloyds/North River because he believed that the claim would be dispersed over too many years to trigger the policy minimums. But he had no information on the period of operation of the Dawn Mining site. [109] Nor

did he consider that Newmont believed that its other layers of insurance would have been exhausted by its settlements with other CGL Insurers. [110] Additionally, Aylward was under the impression that litigation over Pinal Creek had been resolved at the time of the buy back. [111] Joy Hansen testified that Pinal Creek was a concern for Newmont at that time and that the litigation was still pending. [112]

TIG also failed to prove that Newmont's allocation was not in accord with its settlements with other insurers. [113] Aylward compared the Lloyds/North River settlement with the settlements of four other CGL Insurers. [114] Although none of those settlements involved policy buy backs, the amounts paid by those CGL Insurers with respect to Idarado and Resurrection, as a percentage of their total liability limits, were in the approximate range of the entire Lloyds/North River settlement (1% to 8.9% of total limits). [115] But TIG presented no evidence that these CGL Insurers and Newmont were similarly situated. Newmont argues that one of these carriers only covered risks over eighteen days, while Lloyds/North River provided coverage for a total of twenty-one years. [116] Another carrier was not even an insurer of Newmont during the relevant time peri-

---

105. *Travelers Cas. & Sur. Co.*, 419 F.3d at 189 (quoting *North River Ins. Co. v. CIGNA Reinsurance Co.*, 52 F.3d 1194, 1216 (3d Cir. 1995)) (emphasis in original). Bad faith requires a showing of culpability amounting to at least gross negligence or recklessness. *See id.* at 194 (citations omitted).

106. *See* Tr. at 62 (Aylward).

107. *See id.* at 106 (Aylward).

108. *See id.* at 56, 63 (Aylward). Aylward conceded that Newmont surrendered potential claims related to six to ten mining sites. *See id.* at 56 (Aylward).

109. *See id.* at 91 (Aylward).

110. *See id.* at 93–95 (Aylward).

111. *See id.* at 87–89 (Aylward).

112. *See id.* at 241–42 (Hansen).

113. *See Travelers Cas. & Sur. Co.*, 419 F.3d at 194.

114. *See* Tr. at 57–61 (Aylward).

115. *See id.*

116. *See* Newmont's Post–Trial Brief at 6.

od.[117] In sum, TIG has not carried its burden, by a preponderance of the evidence, to demonstrate that Newmont's allocation was unreasonable or in bad faith.

## B. Late Payments

■ Based on all the evidence admitted at the trial I conclude that Newmont breached the Agreement by failing to make three payments in a timely fashion. *First,* TIG has proven that $1,084,769.41 was due, but not paid, as of December 31, 1997. At nine percent per annum, interest accruing until June 5, 1998 amounts to $41,726.46. *Second,* $64,769.41 was due on June 30, 1998, which amount Newmont did not pay until April 28, 2005, resulting in the accrual of interest in the amount of $39,798.58. *Third,* $472,000 was due on June 30, 2002, which amount Newmont did not pay until June 17, 2003, resulting in the accrual of interest in the amount of $40,967.01. TIG's total damages amount to $122,492.05.

■ Newmont offered no defense at trial to the claims for interest on the payments due June 30, 1998 and June 20, 2002.[118] Newmont offered a statute of limitations defense to the claim for interest on the payment due December 31, 1997. Newmont asserts that the six year statute of limitations on that claim elapsed on December 31, 2004, five months before TIG commenced this action.[119] However, Newmont is estopped from asserting the statute of limitations defense because it was Newmont's failure to make timely reports of its collections under the Agreement that induced TIG's delay in bringing the action.[120] The Agreement obligated Newmont to inform International and remit payment when it had collected settlement proceeds in excess of fees and expenses.[121] Newmont informed International on February 2, 1998, that it had reached settlements with certain CGL Insurers, but claimed that not all settlements had been *collected,* obscuring the fact that a payment might have been due on December 31, 1997.[122] International had no reason to know the June 5, 1998 payment should have been made on December 31, 1997 until discovery in this action revealed the actual dates of Newmont's collections from the CGL Insurers. International did not waive its claim to collect interest on this amount, because it expressly reserved all rights in connection with the Agreement.[123]

## C. Prevailing Party

■ Both parties argue that they are the prevailing party for purposes of an award of fees and costs.[124] Although TIG has won a judgment in this litigation, it has not prevailed on the allocation issue, its most substantial claim. However, the judgment against Newmont is not de minimis. Thus, neither party's success in this action is sufficient to justify a finding that either is the prevailing party for purposes

---

117. *See id.*

118. In closing arguments, Newmont's counsel asserted that these payments were delayed due to Newmont's difficulties in calculating fees and expenses in a timely manner. *See* Tr. at 381. Newmont offered no evidence to substantiate any defense based on this assertion, which, in any event, was not a valid excuse under the Agreement.

119. *See* N.Y. C.P.L.R. § 213(2).

120. *See Bank Brussels Lambert,* 2005 WL 756859, at *3.

121. *See* Agreement ¶ 10.

122. *See* 2/2/98 Letter at 1.

123. *See* 6/16/98 Letter.

124. *See* Agreement ¶ 12.

of an award of fees and costs under the Agreement.

## D. Prejudgment Interest

Pursuant to the Interest Opinion, prejudgment interest on TIG's award is calculated as follows. *First*, prejudgment interest on the judgment amount of $41,726.46,[125] accruing from June 5, 1998 to the date of judgment is $27,892.71. *Second*, prejudgment interest on the judgment amount of $39,798.58,[126] accruing from April 28, 2005 to the date of judgment is $1,903.79. *Third*, prejudgment interest on the judgment amount of $40,967.01,[127] accruing from June 17, 2003 to the date of judgment is $8,828.67. Thus, prejudgment interest totals $38,625.17 on a total judgment of $122,492.05.

## IV. CONCLUSION

For the foregoing reasons, TIG is awarded $161,117.22 in damages against Newmont for breach of contract, inclusive of statutory interest. The Clerk of the Court is directed to close this case.

SO ORDERED.

---

**125.** This award is interest at nine percent per annum on $1,084,769 accruing from December 31, 1997 to June 5, 1998.

**126.** This award is interest at nine percent per annum on $64,769.41 accruing from June 30, 1998 to April 28, 2005.

**127.** This award is interest at nine percent per annum on $472,000 accruing from June 30, 2002 to June 17, 2003.